[No. 42426-6-II.   Division Two.   February 20, 2013.]

NORTHWEST PROPERTIES BROKERS NETWORK, INC., ET AL.,
*Respondents*, v. EARLY DAWN ESTATES HOMEOWNERS'
ASSOCIATION, *Appellant*.

Van Deren, J., delivered the opinion for a unanimous court.

*Denise J. Lukins* (of *Law Office of Denise J. Lukins*), for appellant.

*Stephen G. Leatham* (of *Heurlin Potter Jahn Leatham & Holtmann*), for respondents.

¶1 VAN DEREN, J. — The trial court issued a declaratory judgment in this dispute about the relative rights and obligations of servient and dominant easement holders. Early Dawn Estates Homeowners' Association (EDE), the servient easement owner, appeals the trial court's rulings granting relief to Frank Fredericks, the dominant easement owner, settling the dispute over the uses of his easement. There is no dispute that the easement is located over a road

within the development that provides access to EDE, the county road, and Fredericks's four-house development, which includes his business and personal residence. Based on the nature of the disputed issues and the trial court's rulings, we review the trial court's rulings for abuse of discretion instead of reviewing them de novo, the usual standard of review for a declaratory judgment case.

¶2 EDE argues that the trial court abused its discretion when it concluded that (1) EDE unreasonably interfered with Fredericks's easement rights when it denied him a key to the control box of the locked access gate so he could leave the gate open at will, (2) Fredericks need pay only a pro rata share of the maintenance costs for his portion of the road easement, (3) Fredericks could include his two business names on the directory at the access gate and could post a sign for his property at the entrance, and (4) Fredericks's use of his all-terrain vehicle (ATV) did not exceed the scope of his easement.

¶3 We reverse the trial court's conclusion that EDE unreasonably interfered with Fredericks's easement rights when it required him to obtain permission to leave the locked gate open and refused to give him a key to the control box; thus, we vacate that order but we affirm the trial court's other rulings.

## FACTS

¶4 EDE is a 31-lot residential community created in 1978, located off Gabriel Road in Yacolt, Washington. Fredericks purchased property adjacent to EDE in 2000. In 2002, he created a four-lot short plat; he then retained one lot and sold the other three. The only access from Gabriel Road (the county road) to the Fredericks's short plat is Northeast 159th Avenue, a private road located within EDE. When Fredericks purchased his property, he obtained

a nonexclusive 60-foot easement for ingress, egress, and utilities along 159th.[1]

I. ROAD MAINTENANCE

¶5 In 1978, the EDE created a road maintenance agreement for roads within the boundaries of the subdivision. EDE's covenants, conditions, and restrictions (CC&Rs), created in 1990, require EDE property owners to maintain and repair roadways in EDE including, but not limited to, 159th, and to pay for such upkeep through roadway maintenance assessments. The annual assessment was $250, but when special projects arose, EDE levied additional assessments. Various EDE members also contributed their labor and services for road maintenance, which reduced the cost of road work to less than what hired contractors would have charged for similar work. Approximately 80 percent of expenditures for road maintenance incurred by EDE were for 159th.

¶6 Although Fredericks is not a party to EDE's road maintenance agreement, he and the other lot owners in his short plat are required to contribute to maintenance of 159th under their own road maintenance agreement. The county's approval for the short plat required Fredericks to create a road maintenance agreement that included "the owners of Lots 1-4 [of Fredericks's short plat] among those responsible for the maintenance of [159th]." Ex. 35, at 6. To obtain county approval, he also had to pave a 25-foot portion of 159th that connects to the county road.

¶7 Fredericks created the required agreement that provided, "[A]ll property owners (Lots 1, 2, 3, & 4) are responsible for maintenance of N[ortheast] 159th Avenue to Gabriel Road." Ex. 8, at 3. The agreement allowed Fredericks's short plat property owners to meet their road maintenance obligation by (1) performing the maintenance themselves, (2) paying subcontractors to have the maintenance per-

---

[1] All references to "159th" in this opinion refer to Northeast 159th Avenue.

formed, or (3) paying association fees for road maintenance. If the parties chose to pay fees, Fredericks's short plat agreement provided that the fees were to be paid first to Fredericks but, "[a]fter all the lots are sold, the property owners will vote [for] a representative to handle the road maintenance." Ex. 8, at 3. The record does not show that the homeowners in Fredericks's short plat had chosen a representative to handle road maintenance.[2]

¶8 Fredericks contributed to road and gate maintenance at various times after he purchased the property, by repairing and sandblasting the gate after its condition had deteriorated and by purchasing truckloads of rock to cover the road on two occasions. He estimated that the total cost for his road and gate maintenance was approximately $4,125.

¶9 Because Fredericks used the road and the gate, EDE asked that he pay the same annual assessment as EDE homeowners. For two years, Fredericks paid the $250 EDE road maintenance assessment, but he stopped paying because he did not believe he should be required to make the same payments as EDE members since he was not a party to EDE's road maintenance agreement and because he had contributed to road and gate maintenance in the past.

II. The Gate

¶10 In the early 1990s, before Fredericks purchased his property, EDE installed a security gate at the entrance to 159th. Before the gate's installation, EDE had experienced problems with trespassers who left garbage on the property and who caused road damage.

¶11 In 1999 or early 2000, out of concern for its residents' safety, EDE installed a device that allowed the gate to open automatically in the event of a power failure. As a result of installing the device, the gate could be maintained in an

---

[2] The trial court ruled that by paying the EDE maintenance assessments, Fredericks's three property owners had not voted to have EDE as their representative.

open position by turning off the gate's power at its electrical panel.

¶12 Eventually, trespassers discovered how to turn off the gate's electrical power to open the gate and access the property. On one occasion after the gate was left open, an EDE resident was the victim of an armed home invasion. EDE then repeatedly installed a locked plastic cover over the electrical panel, but each time EDE did so, the lock and plastic cover were broken off. As a result, in 2008, EDE installed a locked metal cover over the gate's electrical panel. For security, only a limited number of EDE residents were given keys to the metal cover. In addition, because frequently turning off the power at the electrical panel could damage the panel and could result in increased maintenance costs, EDE did not want the gate's electrical power turned off on a regular basis.

¶13 The gate could be opened in four ways. First, homeowners could use a remote device to open the gate from their vehicles. Second, a keypad near the gate allowed each homeowner to enter their personal four-digit code to open the gate, and they could also give the code to their guests. The code could be changed at the homeowner's request. Third, guests could use a directory located near the keypad to find the two-digit number of the person whose property they sought to access. When the visitor entered the code, it alerted the homeowner on either their cellular or home telephone and the homeowner could remotely open the gate using his or her telephone. Finally, the gate could be opened by turning off the gate's power at the gate's electrical panel.[3]

¶14 EDE established gate opening guidelines providing that the gate could be left open only upon prior authorization by an EDE board member or designated representative. The guidelines required that an "Event" sign be at-

---

[3] EDE also supplied all emergency responding agencies with an access code to the gate.

tached to the gate when it was left open to inform the other lot owners that the gate was open for an authorized purpose and that it was not malfunctioning. The guidelines granted "sole[ ] . . . discretion" to any EDE board member or other designated EDE representative to deny a request to leave the gate open. Ex. 19.

¶15 Before EDE installed the cover on the electrical panel, EDE's former president gave Fredericks permission to leave the gate open and showed him how do so using the electrical panel. Fredericks did not have cellular telephone reception on his property, so visitors could call him only on his home telephone if they needed him to open the gate. Because Fredericks spent significant time outdoors, he would leave the gate open so he would not have to remain by the telephone while awaiting a visitor. When Fredericks developed the short plat and constructed his home, he also frequently left the gate open during the day so construction workers could access his property. After EDE installed the locked metal cover, Fredericks gave his code to contractors who were performing work on his home, but he testified that he did not feel comfortable doing so because he felt that it compromised security.

¶16 After EDE installed the locked metal box over the electrical panel, Fredericks requested a key to it but EDE denied his request. In 2010, Fredericks asked on multiple occasions that EDE leave the gate open. Although EDE granted his request on the first two occasions, his subsequent request was denied because EDE determined that on the occasions when EDE allowed Fredericks to leave the gate open, he failed to comply with EDE's gate opening guidelines. Fredericks then requested that the gate be left open 9 AM to 5 PM, Monday through Friday, but EDE also denied this request due to security concerns.

III. Signage

¶17 Fredericks operated a realty company out of his home and his significant other, Kimberlee Main, operated

an adult family home on the property. The only patient at the adult family home was Fredericks's father, and no clients had ever visited his realty business at his home office. Nevertheless, Fredericks requested that the names of these two businesses be placed on the directory near the gate, but EDE denied his request. At trial, Fredericks also asked that EDE allow him to place a sign for his short plat at the entrance to 159th, next to a 10- to 20-foot sign for EDE.

## IV. ATV USE

¶18 Fredericks owned an ATV that he would occasionally drive on 159th to pick up his mail, but he used the ATV primarily for transporting gardening supplies on his property and he used approximately only one tank of gasoline per year. EDE objected to Fredericks's use of the ATV on 159th.

## PROCEDURAL FACTS

¶19 Fredericks sued EDE for declaratory relief. He claimed that EDE's refusal to give him a key to the box covering the gate's electrical panel constituted an unreasonable interference with his easement rights, and he requested that the trial court require that EDE provide him with a key. He also requested that the trial court require EDE to allow him to display his and Main's business signs on the directory at the gate and that the trial court determine that he was not required to pay road maintenance assessments to EDE.

¶20 EDE counterclaimed that Fredericks had been unjustly enriched by EDE's past maintenance of 159th and requested a judgment of $960. It also requested a declaratory judgment that Fredericks was required to pay the same annual assessments as EDE members. EDE further requested a declaratory judgment that Fredericks was prohibited from placing business signs at the access gate

and a permanent injunction prohibiting such signs; and, finally, it requested an injunction prohibiting Fredericks from driving his ATV within EDE or on 159th.

¶21 The trial court granted Fredericks's requested relief and dismissed EDE's counterclaims. The trial court ruled that (1) Fredericks was responsible for paying his pro rata share of expenditures by EDE for road maintenance and repair, as well as expenses incurred to maintain and operate the gate, but he was not required to pay the $250 annual assessment paid by EDE members; (2) Fredericks was not unjustly enriched by EDE's past maintenance of the road; and (3) in calculating what Fredericks owed to EDE for road maintenance in the future, no monetary value would be attributed to road work performed voluntarily by either Fredericks or EDE.

¶22 Regarding gate access, the trial court concluded that (1) EDE unreasonably restricted Fredericks's easement rights by requiring him to ask for approval to leave the gate open and by denying him a key to the gate's electrical panel and (2) Fredericks is "entitled to leave the access gate open as he deems reasonably necessary," provided that he place an " 'Event' " sign at the gate when he leaves it open. Clerk's Papers (CP) at 40-42.

¶23 Finally, the trial court (1) ordered that the names of Fredericks's and Main's home businesses be placed on the directory at the gate, (2) permitted Fredericks to install a sign identifying that the gate serves as access to his short plat, and (3) prohibited EDE from restricting Fredericks's use of his ATV within the boundaries of his easement on 159th.

¶24 EDE appeals.

## ANALYSIS

¶25 EDE challenges the trial court's conclusions that (1) requiring Fredericks to secure permission to leave the security gate open unreasonably interfered with his easement

rights, (2) Fredericks must pay only his pro rata share of costs to maintain 159th but not EDE's annual assessments, (3) Fredericks is permitted to list his and Main's business names on the gate's call box and to post a sign indicating his development at the entrance to 159th, and (4) Fredericks is permitted to use his ATV on 159th. We agree that the trial court erred in concluding that Fredericks's easement rights were unreasonably interfered with by requiring him to ask permission to leave the gate open, a security precaution imposed on all other homeowners who use 159th.

I. STANDARD OF REVIEW

█ █ ¶26 At the outset, we note that the cases relied on by both parties involve appeals from the trial court's award of injunctive relief regarding the relative rights of easement holders. Injunctive relief is an equitable remedy, and we review the trial court's decision to grant an injunction and the terms of that injunction for abuse of discretion. *Kucera v. Dep't of Transp.*, 140 Wn.2d 200, 209, 995 P.2d 63 (2000); *Steury v. Johnson*, 90 Wn. App. 401, 405, 957 P.2d 772 (1998).

█ █ ¶27 But here, unlike the cases the parties rely on, both the parties and the trial court characterized this matter as declaratory, not injunctive, in nature. We apply customary principles of appellate review to an appeal of a declaratory judgment. *To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 410, 27 P.3d 1149 (2001). These customary principles require that we review the trial court's conclusions of law de novo and the trial court's findings of fact for substantial evidence. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003). Interpreting an easement is a mixed question of law and fact. *Sunnyside*, 149 Wn.2d at 880. The easement's scope is determined by looking to "the intentions of the parties connected with the original creation of the easement, the nature and situation of the properties subject to the ease-

ment, and the manner in which the easement has been used and occupied." *Logan v. Brodrick*, 29 Wn. App. 796, 799, 631 P.2d 429 (1981). "What the original parties intended is a question of fact and the legal consequence of that intent is a question of law." *Sunnyside*, 149 Wn.2d at 880.

¶28 EDE nevertheless contends that "[a]lthough this matter was characterized as a declaratory judgment, the court decided this issue based on equitable princip[le]s." Br. of Appellant at 29. Thus, EDE argues, we review the trial court's conclusions for abuse of discretion. EDE is correct.

¶29 The record shows that the parties and the trial court characterized the relief at trial as a declaratory judgment. At trial, Fredericks requested only that the trial court enter a declaratory judgment stating his rights and obligations as an easement holder; he did not request injunctive relief. EDE counterclaimed for injunctive relief on the ATV issue, but the trial court dismissed the claim, ruling that "EDE may not restrict [Fredericks] or his invitees from operating [ATV]s within the scope of [Fredericks's] easement." CP at 42.

¶30 In addition, the trial court's first conclusion of law provides, "This case presents justiciable controversies that are appropriately the subject of declaratory relief," and it does not mention injunctive relief. CP at 40. And in its second conclusion of law (pertaining to Fredericks's road maintenance obligations), the trial court specifically ruled that Fredericks was "legally responsible" to pay his proportionate share of road maintenance, and crossed out language in the same sentence pertaining to "fairness and equity." CP at 40. Thus, the record clearly shows that the trial court referred to its rulings as declaratory or legal in nature, and not injunctive or within the trial court's discretion.

¶31 Nevertheless, the nature of the disputed issues and the trial court's rulings regarding the easement lead us to review those rulings for abuse of discretion. First, the

parties here do not dispute the existence, nature, or definition of their relative easement rights; rather, their disputes relate to their relative burdens and the allowable uses of the undisputed easement. Second, the trial court was asked to formulate equitable remedies and means to enforce the parties' relative rights and obligations. So although the case was pleaded as a declaratory judgment, the actual relief requested and granted was equitable.[4]

¶32 Accordingly, we review the trial court's rulings for abuse of discretion, and we "give great weight to the trial court's decision, interfering only if it is based on untenable grounds, is manifestly unreasonable or is arbitrary." *Steury*, 90 Wn. App. at 405. And because EDE does not assign error to the trial court's findings of fact, they are verities on appeal. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808, 828 P.2d 549 (1992).

II. EASEMENT RIGHTS

A. Gate

¶33 EDE complains that the trial court abused its discretion when it concluded that "[r]equiring [Fredericks] to secure the approval of EDE in order to leave the access gate open is an unreasonable restriction on his rights as an easement holder." CP at 40. It also asserts that the trial court should not have required EDE to give Fredericks a key to the locked electrical box. We agree.

¶34 Fredericks did not argue at trial that the gate itself interfered with the use of his easement. Rather, Fredericks argued, and the trial court agreed, that requiring Fredericks to seek prior approval from EDE to leave the gate open was an unreasonable interference with his easement rights. We disagree and reverse this portion of the trial court's order.

---

[4] The cases the parties rely on are also unclear in their wording of the appropriate standard of review. *See, e.g., Lowe v. Double L Props., Inc.*, 105 Wn. App. 888, 893, 20 P.3d 500 (2001) ("[t]he issue is whether the trial court erred by abusing its discretion"). We attempt to clarify the type of relief requested and the appropriate standard of review here.

¶35 The deed to Fredericks's short plat included the easement over 159th that provided "a 60 foot easement for ingress, egress and utilities." Ex. 4. The easement is silent on the subject of gates. But the gate had been installed in the 1990s, before Fredericks purchased his property in 2000.

¶36 " '[I]f the easement is ambiguous or even silent on some points, the rules of construction call for examination of the situation of the property, the parties, and surrounding circumstances.' " *Colwell v. Etzell*, 119 Wn. App. 432, 439, 81 P.3d 895 (2003) (alteration in original) (quoting *Rupert v. Gunter*, 31 Wn. App. 27, 31, 640 P.2d 36 (1982)). Similarly,

> [w]hether or not the owner of land, over which an easement exists, may erect and maintain fences, bars, or gates across or along an easement way, depends upon the intention of the parties connected with the original creation of the easement, as shown by the circumstances of the case; the nature and situation of the property subject to the easement; and the manner in which the way has been used and occupied.

*Rupert*, 31 Wn. App. at 30-31. Here, there is no issue about whether the existence or nature of the gate on 159th exceeds the scope of the easement—it was in place when Fredericks purchased the property—and the record shows that it was intended to deter unapproved entry to the developments.

¶37 The issue then turns on whether the relative burdens on the easement were unreasonably allocated when EDE installed a more secure gate and required prior permission to leave it open for long periods of time. *Rupert* also addressed this issue:

> When the owner of a servient estate is being subjected to a greater burden than that originally contemplated by the easement grant, the servient owner has the right to restrict such

use and to maintain gates in a reasonable fashion necessary for his protection, as long as such gates do not unreasonably interfere with the dominant owner's use.

31 Wn. App. at 31. Accordingly, when determining whether a gate or its ease of use unreasonably interferes with easement rights, we consider (1) the increased burden on the servient estate, (2) whether the restrictions on the gate are reasonably necessary for protection, and (3) the degree to which the gate interferes with the dominant owner's use.

¶38 EDE relies on *Rupert* to support its contention that the trial court abused its discretion when it concluded that requiring Fredericks to seek approval prior to leaving the gate open was an unreasonable restriction on his easement rights. In *Rupert*, servient estate holders constructed a gate across a dominant estate holder's easement to prevent the general public from speeding down their private road. 31 Wn. App. at 29. The gate was heavy and difficult to open, and when the dominant estate holder brought suit for injunctive relief, the trial court required that the servient estate holders take down the heavy gate but gave them the option of erecting a more lightweight aluminum one in its place. *Rupert*, 31 Wn. App. at 29-30. We concluded that because "the parties to the original easement did not intend for the public to speed along the easement way," there was an increased burden on the servient estate and, thus, the gate was reasonably necessary for protection because it would hinder the general public from driving on the road. *Rupert*, 31 Wn. App. at 31-32. We also held that the gate did not unreasonably interfere with the dominant estate holder's use of his easement because the trial court required that the gate be lightweight and easy to open and close from either direction and required the servient estate holders to pay the gate construction costs. *Rupert*, 31 Wn. App. at 31-32.

¶39 EDE points to its increased burden because the gate's electrical panel was being misused to leave the gate open, providing access to trespassers and presenting poten-

tial danger to its homeowners. Thus, it argues, the lock on the electrical box and restrictions on when the gate could be left open for extended periods were reasonably necessary for EDE homeowners' protection. We agree.

¶40 Before EDE installed the gate, trespassers frequently entered the property and caused damage to the roads. The gate temporarily deterred trespassers, but once it was discovered that the gate could be disabled using the electrical box, EDE was again subject to the problems that it suffered before installing the gate, including a home invasion. And Fredericks left the gate open on a regular basis.

¶41 To remedy the problem, EDE attempted multiple times to install plastic covers over the electrical box, but those covers and locks were broken off. EDE indicated that it did not give Fredericks a key to the locked metal box because if it did, it would also be required to give all other EDE members a key, which would more significantly compromise security.

¶42 With respect to Fredericks's interest as the dominant estate holder, EDE argues that restricting Fredericks's ability to leave the gate open is not an unreasonable interference with the use of his easement. Fredericks contends that denying him the ability to leave the gate open at will is an unreasonable restriction on his rights as an easement holder because he was permitted to leave the gate open when he purchased his property and, thus, the locked electrical panel was a new restriction on his rights.

¶43 But although Fredericks was able to leave the gate open when he moved to the property, the purpose of the gate was to provide security. When it became clear that the gate as it was being operated did not provide adequate security, EDE implemented reasonable measures to accommodate the changed conditions. It was permitted to do so, regardless of how the gate access had been handled previously,

provided it did not unreasonably interfere with Fredericks's use of the easement. *Rupert*, 31 Wn. App. at 31.

¶44 Here, the restriction on leaving the gate open at will is not an unreasonable interference with Fredericks's easement. Denying Fredericks the ability to leave the gate open at will does not preclude him from opening the gate altogether. Although Fredericks contends that "nothing in the easement itself compels the conclusion that Fredericks should have to be saddled to his telephone [sic] whenever it is possible that someone will come to his home," Fredericks can give his guests his four-digit code to enable them to open the gate without calling him. Br. of Resp't at 17. In fact, Fredericks testified that contractors have successfully used the code to access the property. And although Fredericks testified that he did not feel comfortable giving contractors his code, the code can be easily changed once a project is complete and Fredericks has, in fact, changed his code multiple times. Finally, there is no legitimate health or safety concern resulting from the locked gate, as EDE has provided emergency response agencies with an access code to the gate.

¶45 There is no dispute that the parties to the original easement did not intend for trespassers to access and cause damage to the property or endanger the homeowners, and thus, we hold that EDE experienced a greater burden than that originally contemplated when trespassers or others who committed criminal acts against the homeowners could gain uncontrolled access to EDE and Fredericks's development. *Rupert*, 31 Wn. App. at 31. Installing a locked electrical box along with at least three easy means to open the gate and requiring notice of an extended, unlocked opening allows EDE to provide security to all homeowners without burdening Fredericks's easement unreasonably. We hold that by installing the locked metal cover on the gate's electrical panel, EDE maintained the gate in a fashion reasonably necessary for all homeowners' protection. *Rupert*, 31 Wn. App. at 31.

¶46 Accordingly, we hold that the trial court abused its discretion in ruling that EDE unreasonably burdened Fredericks's easement in refusing to give him a key to the locked box and requiring him to ask for approval before he leaves the gate open for an extended period. *Rupert*, 31 Wn. App. at 31. We reverse and vacate that portion of the trial court's order.

B. Road Maintenance

¶47 EDE next argues that the trial court erred when it required Fredericks to pay only a pro rata share of expenses actually incurred by EDE in repairing and maintaining 159th instead of paying the $250 annual EDE assessment. The trial court concluded that Fredericks was responsible for maintenance of the road, under both the county code and his own short plat declaration. Neither party disputes this conclusion. Rather, EDE argues that the trial court erred in failing to impose EDE's annual road maintenance assessment on Fredericks.

¶48 Under Clark County Code (CCC) 40.350-.030(C)(4)(g),[5] all private roads within the county "shall be maintained by the owners of the property served by them and kept in good repair at all times." The county code also requires that a private maintenance covenant be recorded with the county auditor for any private road serving more than three lots. CCC 40.350.030(C)(4)(g). In accordance with these requirements, Fredericks agreed in his short plat declaration that "all property owners (Lots 1, 2, 3, & 4) are responsible for maintenance of N[ortheast] 159th Avenue to Gabriel Road." Ex. 8, at 3. Based on this evidence, the trial court concluded that Fredericks was "legally responsible to pay a proportionate share of the expenses incurred by EDE to repair and maintain [his] easement road and to repair, operate, and maintain the access gate." CP at 40.

---

[5] EDE cites CCC 12.05A.770 in its brief, but that section was repealed in 2003 and was replaced by CCC 40.350.030(C)(4). Clark County Ordinance 2003-11-01.

¶49 Although the trial court characterized its decision as legal, this ruling is both legal and equitable. The legal conclusion, which the parties do not dispute, is that Fredericks was responsible for road maintenance under his own agreement and the county code. The equitable portion relates to the remedy or how Fredericks's portion of maintenance for 159th is to be paid for or accomplished.

¶50 The three cases EDE predominately relies on are unpersuasive and do not support its contention that the trial court abused its discretion when it determined that Fredericks was not required to pay EDE's annual road maintenance assessment. *Bushy v. Weldon*, 30 Wn.2d 266, 191 P.2d 302 (1948); *Okoboji Camp Owners Coop. v. Carlson*, 578 N.W.2d 652 (Iowa 1998); *Brentwood Subdivision Rd. Ass'n v. Cooper*, 461 N.W.2d 340 (Iowa App. 1990). In *Bushy*, our Supreme Court affirmed the trial court's conclusion that owners of adjacent parcels, who each had an easement over a common driveway, were required to split maintenance costs for the driveway equally. 30 Wn.2d at 268, 271-72. *Brentwood*, an Iowa Court of Appeals case, dealt with lot owners in a subdivision who refused to pay road maintenance assessments. 461 N.W.2d at 341. Recognizing that "when property owners commonly use private roads as ways of necessity, all of those owners should be required to contribute equally to the maintenance of those roads," the Iowa appellate court held that the parties were "required to contribute financially to the corporation for maintenance and upkeep of the roads." *Brentwood*, 461 N.W.2d at 342.

¶51 EDE argues that as in *Bushy* and *Brentwood*, Fredericks was required to contribute to the maintenance and repair of 159th and, thus, he should be required to pay a share equal to what EDE's members pay annually for road maintenance. But *Bushy* and *Brentwood* are distinguishable. In those cases, the parties made equal use of the road and, thus, requiring each party to pay an equal amount was the proper result. Here, the EDE assessments

are applied not only to maintenance of 159th, but also to other roads within the EDE subdivision. And Fredericks's legal obligations do not extend to maintenance of those EDE roads.

¶52 Finally, in *Okoboji*, members of a cooperative within a subdivision that maintained the subdivision's common areas sought restitution from subdivision lot owners who refused to pay the cooperative's maintenance fees. 578 N.W.2d at 653. The Iowa Supreme Court held, "Because defendants are not members of the cooperative, they are not bound to accept the value ascribed to these benefits by the cooperative's board of directors. To obtain restitution, the cooperative must offer proof of the reasonable value of the benefits conferred." *Okoboji*, 578 N.W.2d at 654. Concluding that such proof was offered, the Iowa Supreme Court affirmed the trial court's award of restitution to the cooperative, despite evidence indicating that some of the fees were contributed toward services that the dissenting homeowners did not use. *Okoboji*, 578 N.W.2d at 654.

¶53 EDE asserts that because the proof of benefits conferred in *Okoboji* "included items that the complaining parties did not make use of," the $250 annual EDE assessment should have been imposed on Fredericks despite that he was not an EDE member and he did not have an easement on roads other than 159th. But the *Okoboji* court explicitly rejected the argument that the nonmembers were required to pay the value of the services as dictated by the cooperative. 578 N.W.2d at 654. Rather, it required a determination of the actual value of the services, which is what the trial court did here when it required Fredericks to pay his pro rata share of actual costs instead of EDE's required $250 assessment. *Okoboji*, 578 N.W.2d at 654.

¶54 The trial court concluded that EDE consists of 31 lots and that 6 other lots, including the 4 lots in Fredericks's

short plat, use 159th.[6] Thus, Fredericks's proportional share of road maintenance costs was 1/37th of the total cost to maintain 159th.

¶55 We hold that the trial court did not abuse its discretion in formulating a remedy for the dispute over how Fredericks was to pay his share of maintenance costs for 159th. It was within the trial court's discretion to order that Fredericks was not required to pay EDE's annual road maintenance assessment but that he was required to pay his pro rata share of actual maintenance costs incurred by EDE for 159th.[7]

---

[6] Although the trial court found that there were 31 lots within EDE, Fredericks testified that there were 32 lots, and a map of the property shows 31 numbered lots, but lot 1 is divided into lots 1A and 1B, indicating that they may be separate legal parcels. It is clear that Fredericks's short plat contains four lots. But because the parties do not challenge the trial court's finding that there are 37 lots that use 159th, that finding is a verity on appeal. *Cowiche Canyon*, 118 Wn.2d at 808.

[7] EDE makes three additional arguments, none of which has merit. EDE first argues that the trial court erred when it concluded that no monetary value would be attributed to work performed voluntarily by either party on 159th. It also contends that the trial court erred when it concluded that the other Fredericks short plat owners did not designate EDE as their " 'road representative.' " Br. of Appellant at 28. But EDE fails to support these contentions with argument or citation to authority instructing this court as to the nature of the alleged legal errors. Accordingly, we decline to address them. RAP 10.3(a)(6); *Am. Legion Post No. 32 v. City of Walla Walla*, 116 Wn.2d 1, 7, 802 P.2d 784 (1991).

EDE also contends that the trial court's decision results in unjustly enriching Fredericks. The *"Restatement (Third) of Restitution* explains that a person who is unjustly enriched at the expense of another is liable in restitution to the other." *Cox v. O'Brien*, 150 Wn. App. 24, 36, 206 P.3d 682 (2009); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1, at 3 (2011). "A person has been unjustly enriched when he has profited or enriched himself at another's expense, contrary to equity." *Cox*, 150 Wn. App. at 37. To prevail on a claim for unjust enrichment, EDE must demonstrate the following:

> (1) one party must have conferred a benefit to the other, (2) the party receiving the benefit must have knowledge of that benefit, and (3) the party receiving the benefit must accept or retain the benefit under circumstances that make it inequitable for the receiving party to retain the benefit without paying its value.

*Cox*, 150 Wn. App. at 37.

The trial court concluded that the improvements Fredericks previously made to the road absolved him of the duty to pay EDE for maintenance EDE had performed through 2010. EDE does not contest this conclusion, and the record supports it. On appeal, EDE's unjust enrichment argument focuses only on Fredericks's unjust enrichment in the *future*. EDE contends that the trial court's

## C. Signs

¶56 EDE next contends that the trial court erred[8] when it required that EDE allow Fredericks to place the names of his and Main's home businesses on the gate's directory and to place a sign indicating the presence of Fredericks's short plat at the entrance to 159th. We again disagree.

¶57 EDE first argues that because "both Fredericks'[s] and EDE's CC&Rs preclude business signs" and because the easement is an extension of Fredericks's short plat, Fredericks's inclusion of his business names on the directory and a sign indicating his short plat are violations of his CC&Rs. Br. of Appellant at 35. Fredericks's short plat CC&Rs provide, "No sign shall be erected, maintained, or displayed on any lot, except signs advertising the property for sale or rent, or any type of ornamental name plate." Ex. 8, at 6. EDE argues that Fredericks's and Main's business names on the gate's directory constitute "signs." Br. of Appellant at 35. Thus, noting that " '[e]asements appurtenant become a part of the realty which they benefit,' " EDE contends that "[i]t is nonsensical for Fredericks to argue . . . that he can do something on an easement appurtenant to his lot that he could not do on the lot itself." Br. of Appellant at 36 (quoting *Clippinger v. Birge*, 14 Wn. App. 976, 986, 547 P.2d 871 (1976)).

¶58 EDE apparently seeks to enforce Fredericks's short plat CC&Rs against Fredericks. Before a covenant can be enforced against a property owner, the party seeking

---

decision results in unjustly enriching Fredericks because it "creates the possibility that the other road users will end up subsidizing Fredericks'[s] share should he fail to pay," "forces the other road users back to court for a determination every time Fredericks asserts that a particular cost is not allowable or if he simply refuses to pay," and "place[s] an additional administrative burden on the EDE board to account for and bill Fredericks on a periodic basis." Br. of Appellant at 24, 27. But these arguments focus on matters that are speculative, and we will not give advisory opinions or address issues that are not ripe. *Davidson v. State*, 116 Wn.2d 13, 30, 802 P.2d 1374 (1991).

[8] Although Fredericks argues that the trial court erred, we review the trial court's conclusions regarding signs on the gate's directory and at the entrance to EDE for abuse of discretion.

enforcement must establish an equitable servitude, which requires

> (1) a promise, in writing, which is enforceable between the original parties; (2) which touches and concerns the land or which the parties intend to bind successors; and (3) which is sought to be enforced by an original party or a successor, against an original party or successor in possession; (4) who has notice of the covenant.

*Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 691, 974 P.2d 836 (1999). EDE fails to allege that it has an enforceable equitable servitude or that it otherwise has standing to enforce Fredericks's CC&Rs and fails to provide support for its interpretation of those CC&Rs. Accordingly, EDE's argument fails.[9] RAP 10.3(a)(6); *Am. Legion Post No. 32 v. City of Walla Walla*, 116 Wn.2d 1, 7, 802 P.2d 784 (1991).

¶59 EDE next contends that allowing Fredericks to provide his and Main's business names on the directory and indicate the short plat at the entrance to 159th exceeds the scope of Fredericks's easement because "[b]usiness signs are in no way related to the use of the easement for ingress, egress and utilities." Br. of Appellant at 36-37. The easement is silent on the subject of signs. But EDE interprets ingress too narrowly in this argument and this dispute

---

[9] But even if we were to address EDE's claim, it is without merit. EDE argues that Fredericks's business names on the directory constitute "signs" and, thus, are in violation of his CC&Rs. EDE provides the following definition of a "sign": " 'a means of conveying information, as a name, direction, warning or advertisement, that is prominently displayed for public view.' " Br. of Appellant at 35 (quoting THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED). It is clear from this definition that Fredericks's and Main's business names on the directory would constitute signs. But under EDE's definition, EDE residents' names on the directory are also signs. Thus, the only argument in support of its contention, if applied, would in fact support the conclusion that posting *any* names on the directory would violate both EDE's and Fredericks's CC&Rs. It is this result, not the trial court's decision to allow Fredericks to post his and Main's business names, that is "nonsensical." Br. of Appellant at 36.

Regarding the sign at the entrance to 159th for Fredericks's short plat, the short plat CC&Rs permit "any type of ornamental name plate" to be displayed on the property. Ex. 8, at 6. A sign indicating the presence of the short plat may meet the definition of an "ornamental name plate" and, thus, is not precluded by Fredericks's CC&Rs.

relates to use of the undisputed easement rights, not the scope of Fredericks's easement.

¶60 One of the methods by which a visitor can access both EDE and Fredericks's short plat is by looking up the homeowner's name on the gate's directory and inputting the two-digit access code that accompanies the name. The homeowner then receives a telephone call and can either grant or deny access to the property using his or her telephone. Thus, the names on the gate's directory, although they may be considered "signs," are more appropriately categorized as a means of access to the easement. Clearly, access to an easement is contemplated within an easement for ingress and egress.

¶61 In addition, EDE constructed a sign behind the mailbox area at the entrance to the subdivision identifying EDE, and EDE has failed to indicate why Fredericks should be precluded from identifying the existence of his property when EDE has similarly done so. Considering the manner in which signs have been employed on the easement in the past and the conditions surrounding the signs, we hold that posting Fredericks's and Main's business names on the directory and a sign for his short plat outside the gate neither exceeded the scope of Fredericks's easement nor constituted an abuse of the trial court's discretion. *Colwell*, 119 Wn. App. at 439.

### D. ATV Use

¶62 Finally, EDE argues that Fredericks's ATV use on 159th exceeded the scope of his easement. EDE appears to argue that the trial court both (1) abused its discretion when it prohibited EDE from restricting Fredericks's ATV use on 159th and (2) erred when it concluded that Fredericks was not bound by EDE's CC&Rs that prohibit ATV use within EDE. We disagree.

¶63 EDE relies on *Snyder v. Haynes*, 152 Wn. App. 774, 778, 217 P.3d 787 (2009), where, in an equitable proceeding, a servient estate holder successfully obtained an injunction

against the dominant estate holder's use of ATVs on an easement for ingress, egress, and utilities. Division Three of this court affirmed, holding that the trial court did not abuse its discretion when it prohibited ATV use on the easement. *Snyder*, 152 Wn. App. at 781. It reasoned:

> [T]he mutual easement was created for ingress and egress. Since ATVs . . . cannot legally travel beyond the easement road onto a public road, these types of vehicles were not contemplated by the parties to the 1982 agreement. The trial court found the ATV . . . use was nonconforming recreational touring. While increased use of an easement by a dominant estate holder is acceptable, a changed use by a dominant estate holder is unacceptable.

*Snyder*, 152 Wn. App. at 781.

¶64 But *Snyder* is distinguishable. In *Snyder*, Division Three noted that the trial court heard evidence "regarding non-ingress-and-egress use of [ATVs] and off-road vehicles causing dust and flying gravel on the easement road" and "children driving the vehicles." 152 Wn. App. at 781. Although the dominant estate holders contended that the incidents were rare, Division Three deferred to the trial court's fact-specific inquiry into the evidence and held that "the trial court did not err because it had tenable grounds to conclude that this use overburdened the easement."[10] *Snyder*, 152 Wn. App. at 781.

¶65 Here, unlike in *Snyder*, there was no evidence supporting a conclusion that Fredericks's use of his ATV overburdened the easement. EDE presented no evidence that the ATV constituted a "changed use" of the road or that

---

[10] *Snyder* is one of the cases that refers to a legal standard of review, "err," while reviewing the trial court's decision for an abuse of discretion; i.e., the trial court "had tenable grounds to conclude that this use overburdened the easement." 152 Wn. App. at 781. Because *Snyder* was an equitable proceeding where an injunction was sought, the standard of review was properly abuse of discretion.

it caused damage or disruption.[11] *Snyder*, 152 Wn. App. at 781. EDE apparently relies on its own CC&Rs prohibiting ATV use to support its contention that ATV riding exceeds the scope of the easement. But the trial court properly concluded that Fredericks was not a member of EDE and was not legally bound by its agreements, and EDE provides no authority supporting its contention that Fredericks was bound by its CC&Rs.

¶66 We hold that the trial court did not err when it concluded that Fredericks was not bound by EDE's CC&Rs and that it did not abuse its discretion when it permitted Fredericks to use his ATV on the easement because there was no evidence that Fredericks's ATV use overburdened the easement.

¶67 We reverse the trial court's conclusion that requiring Fredericks to seek permission to leave the gate open was an unreasonable restriction on his easement rights, and thus, we reverse the trial court's ruling requiring EDE to give Fredericks a key to the locked electrical box, but we affirm the remainder of the trial court's rulings.

QUINN-BRINTNALL and PENOYAR, JJ., concur.

---

[11] Although one EDE resident testified that on one occasion the noise from an ATV on 159th kept his children awake, it is not clear from the record that Fredericks was driving the ATV or that the ATV belonged to him.