# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KEVIN SCHOENFELDER and EMILY SCHOENFELDER, husband and wife; KENNETH BERGMAN and PAM BERGMAN, husband and wife; DERYCK WATERMEYER and LINDA WATERMEYER, husband and wife; and MARILYN LEPAPE,<br><br>Respondents,<br><br>v.<br><br>ROBERT LARSON and JENNIFER LARSON, husband and wife,<br><br>Appellants. | No. 48885-0-II<br><br><br>UNPUBLISHED OPINION |

MELNICK, J. — The trial court ruled that Kevin and Emily Schoenfelder, Kenneth and Pam Bergman, Deryck and Linda Watermeyer, and Marilyn Lepape (Neighbors) held a prescriptive easement on Robert and Jennifer Larsons' property. It also ruled that because the parties' express easement was ambiguous, the Larsons were restricted from constructing a fence or structure within 2 1/2 feet of its edges. We affirm.

## FACTS

The Neighbors own homes served by a private, asphalt road that provides access to their properties from Kopachuck Drive NW. Although the Neighbors purchased their properties at different times, the road has been used for ingress and egress from Kopachuck Drive to their

properties since, at least, the 1960s. In January 2015, the Larsons purchased their property from David, Patricia, Barbara, and John King.[1]

The road runs through the Larsons' property before reaching the Neighbors' properties. The road is "approximately 10 feet wide, with curvy turns and in excess of 700 feet long." Clerk's Papers (CP) at 1422. It begins at Kopachuck Drive and runs west, cutting through two parcels of the Larsons' property. It continually slopes south as it reaches the border of Lepape's property. The road runs through Lepape's property, and continues to run south-west through the Shoenfelders' property, the Bergmans' property, and ends at the Watermeyers' property. For years, many vehicles travelled the road, including vehicles driven by family members, guests, delivery and service persons, and emergency service vehicles.

The Schoenfelders', Watermeyers', and Bergmans' properties are benefitted by, and the Larsons' property is encumbered by, an express easement recorded in 1996.[2] The easement grants ingress and egress over and across the road from Kopachuck Drive to the benefitted properties. It grants "non-exclusive surface easement for ingress and egress on five (5) feet on each side of the center line across the existing black topped road" that crosses the parties' respective properties. Ex. 10, at 2.

The road is not wide enough for two oncoming vehicles to pass and remain on the paved area. As a result, the Neighbors regularly use four "turnout areas" along the road so that oncoming

---

[1] The Larsons' 17.5 acre property consists of six tax parcels: one of the tax parcels is improved with a cabin, and the other five are unenclosed and undeveloped. From the 1950s to the 1990s, the deceased parents of the Kings, John Sr. and Doris, resided in the cabin during summer months and used the same private road.

[2] The Lepape property is also benefitted by, and the Larsons' property encumbered by, a separate easement to use the road granted under a warranty deed.

vehicles may pass. CP at 1424. When two oncoming vehicles met on the road, the routine practice was that one of the vehicles would pull entirely off the road into one of the turnouts to allow the other vehicle to pass.

Each turnout area is located on the Larsons' property. One of the turnout areas is located on the upland or south side of the road, and is commonly referred to by the parties as the "meadow." CP at 1425. The meadow is the largest and most frequently used turnout area. A second turnout area, the "triangle," is located on the water or north side of the road, and is comprised of a triangle-shaped area and a clearing adjacent to the Larsons' cabin. CP at 1424. The Kings' now deceased mother also used this area to unload groceries from her car to the cabin. A map of the area follows:



CP at 1446 (survey identifying the easement, the Larsons' parcels, and the border of Lepape's parcel; the "meadow" (B), "triangle" (A), and other turnouts (Y, Z) highlighted).

The Neighbors used the turnouts "openly and notoriously," and to accommodate passing vehicles. CP at 1425. The Neighbors' family members, friends, milkmen, newspaper carriers, landscapers, contractors, and delivery services routinely used the road. The types of vehicles that travelled the road ranged from small vehicles, e.g. Toyota Prius, to large vehicles, e.g. Chevrolet Suburban. At times, some of the Neighbors pulled a boat trailer into the turnout areas.

The Neighbors' also used the turnout areas "continuous[ly] and uninterrupted[ly]." CP at 1425. The turnouts were used by the collective community to accommodate each of the Neighbors and their guests ingress and egress from their respective properties.

When the Larsons decided to purchase the property, they initially planned to build structures in and around the meadow turnout. They also planned to build their home on a portion of their property occupied by the road. Successful implementation of their plans required the Neighbors to agree to relocate the road.

The Neighbors were initially amenable to a new, relocated road, but for a variety of reasons including safety, did not accept the road the Larsons proposed.

In January 2015, knowing that the Neighbors would not accept their proposed road, and before closing on the property, the Larsons hired a land surveyor to survey their property and the road running through it. The surveyor staked the road and erected steel fence posts along the edges of the road. The Larsons' real estate agent suggested to the Kings that building a fence along the road might bring the Neighbors to the table about relocating the road.

Shortly thereafter, some of the Neighbors received a letter from the local fire department regarding the safety of the road as the surveyor staked it. The letter stated that the Larsons' real

estate agent contacted the fire department and that it appeared that the property owner planned to build a fence along the easement road. The letter stated that the road, as staked, would "significantly impact" the fire department's ability to provide emergency services to the families who use the road. Ex. 47, at 1. It further stated:

> Our fire engines and our ambulances both measure eight feet, six inches in width. With doors open to access equipment, they are at least ten feet wide. Due to curves in the road and the design of the vehicles, if a fence is built along that entire easement road, we would not be able to take either an engine or ambulance down that road without destroying the fence and severely damaging our apparatus. In the event of a fire at the end of the easement, we would be compelled to lay over 1,000 feet of hose down the road, which would slow the response a great deal. . . . A fence along the easement would significantly hamper our emergency operations.

Ex. 47, at 1.

In February, the Neighbors filed suit against the Larsons to quiet title in the express easement and for a prescriptive easement in the turnout areas. Several days later, the Neighbors observed heavy equipment on the Larsons' property for the seeming purpose of logging, clearing, and grading the property. No permits had been issued for that type of work. The Neighbors moved for, and the trial court granted, a temporary restraining order and, later, a preliminary injunction to enjoin the Larsons from erecting any stakes, fence posts, or fencing along the boundaries of the road, including the turnout areas.

In February 2016, after a four-day bench trial, the trial court ruled that the Neighbors held a prescriptive easement in the meadow and triangle turnouts. It also ruled that the express easement was 10 feet wide, but it enjoined the Larsons from erecting a fence or structure within 2 1/2 feet from the easement's edges. The court entered findings of fact and conclusions of law consistent with its rulings.

The Larsons appeal.

5

ANALYSIS[3]

I.    PRESCRIPTIVE EASEMENT

The Larsons argue that the findings of fact critical to the trial court's conclusion that the Neighbors held a prescriptive easement in the meadow and triangle turnouts are unsupported by substantial evidence. Specifically, they argue that substantial evidence does not support the finding that the Kings blocked access to the turnout areas as an assertion of their ownership rights. The Larsons also argue that even if the findings are supported by substantial evidence, they do not overcome the presumption of permissive use because the historical use of the road shows, at best, neighborly acquiescence by all parties. We disagree.

A.    FINDINGS OF FACT

We review a trial court's findings of fact for substantial evidence, which is defined as "a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). The party challenging the trial court's findings of fact has the burden to prove they are not supported by substantial evidence. *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990).

We defer to the trial court on issues of conflicting evidence, witness credibility, and persuasiveness of the evidence. *City of Univ. Place v. McGuire*, 144 Wn.2d 640, 652, 30 P.3d 453 (2001). Unchallenged findings of fact are verities on appeal. *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010).

---

[3] The Larsons argue that insufficient evidence supports many of the trial court's findings of fact, and that the conclusions of law are unsupported by the findings. They assign error to the trial court's findings of fact 16, 19, 21-22, 23-26, 28-29, 31 and conclusions of law 5-15.

The Larsons assign error to a number of the trial court's findings of fact and conclusions of law relevant to this issue. We note that some of the challenged findings of fact or portions of them are legal conclusions. We treat those challenged findings as conclusions of law and review them accordingly. *Para-Med. Leasing, Inc. v. Hangen*, 48 Wn. App. 389, 397, 739 P.2d 717 (1987).[4]

At trial, the Schoenfelders testified that, sometime before July 13, 1994, large rocks suddenly appeared in the meadow turnout area. Other Neighbors also testified that they observed rocks in the turnout. The rocks were placed symmetrically along the entire length of the edge of the turnout. Large rocks were also placed in the triangle turnout.

The rocks prevented the Neighbors from using the turnouts with a vehicle. The Watermeyers testified that they once hit the rocks in the meadow turnout and observed others having to drive around the rocks in order to use the turnout. The Schoenfelders initially removed two of the rocks to access the meadow turnout. They subsequently used their Suburban to pound the remaining rocks into the ground in both the meadow and triangle turnouts to make them accessible again. The Neighbors testified that the rocks were gone by 1999.

Although no one knew who placed the rocks in the turnout, the trial court heard substantial evidence to support its findings that John King Sr. placed the rocks in the meadow turnout in an effort to block access to it. Barbara King testified that their father was concerned about people dumping waste in the meadow area, and that the maintenance people he hired may have placed the rocks there to deter trespassers. David King also testified that their father may have been the

---

[4] Additionally, we do not review any of the challenged findings, or portions of the challenged findings, or challenged conclusions of law that are unsupported by substantive argument. *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 808, 225 P.3d 213 (2009).

person who placed the rocks there due to those concerns. John King Sr. also knew it was not possible for two cars to pass each other on the road unless one of the vehicles pulled off the road.

Because there is a quantum of evidence sufficient to persuade a rational fair-minded person the findings are true, we conclude that substantial evidence supports the critical challenged findings. The Larsons challenge other findings of fact. Although we do not discuss them in detail, the record provides substantial evidence to support all of them. We conclude that the Larsons argument on this issue to be without merit.

B.    CONCLUSIONS OF LAW

If substantial evidence supports the findings of fact, we review whether those findings, in turn, support the trial court's conclusions of law. *Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc.*, 102 Wn. App. 422, 425, 10 P.3d 417 (2000). We review a trial court's conclusions of law de novo. *Sunnyside*, 149 Wn.2d at 880.

"To establish a prescriptive easement, the person claiming the easement must use another person's land for a period of 10 years and show that (1) he or she used the land in an 'open' and 'notorious' manner, (2) the use was 'continuous' or 'uninterrupted,' (3) the use occurred over 'a uniform route,' (4) the use was 'adverse' to the landowner, and (5) the use occurred 'with the knowledge of such owner at a time when he was able in law to assert and enforce his rights.'"[5] *Gamboa v. Clark*, 183 Wn.2d 38, 43, 348 P.3d 1214 (2015) (quoting *Nw. Cities Gas Co. v. W. Fuel Co.*, 13 Wn.2d 75, 83, 85, 123 P.2d 771 (1942)).

---

[5] The Larsons only dispute the fourth and fifth elements.

Whether the claimant established the elements of a prescriptive easement is a mixed question of law and fact. *Gamboa*, 183 Wn.2d at 44. We, therefore, review de novo "a trial court's 'conclusion that the facts, as found, constitute a prescriptive easement.'" *Gamboa*, 183 Wn.2d at 44 (quoting *Lee v. Lozier*, 88 Wn. App. 176, 181, 945 P.2d 214 (1997)).

Adverse use generally means that the land was used without the landowner's permission. *Gamboa*, 183 Wn.2d at 44. We start with a presumption, applied under limited factual scenarios, that when a person enters another's land, he or she does so with the true owner's permission, in subordination to the owner's title.[6] *Gamboa*, 183 Wn.2d at 44.

A claimant, however, can defeat the presumption "'when the facts and circumstances are such as to show that the user was [(1)] adverse and hostile to the rights of the owner, or [(2)] that the owner has indicated by some act his admission that the claimant has a right of easement.'" *Gamboa*, 183 Wn.2d at 44-45 (quoting *Nw. Cities*, 13 Wn.2d at 87). "For a claimant to show that land use is 'adverse and hostile to the rights of the owner' in this context, the claimant must put forth evidence that he or she interfered with the owner's use of the land in some manner." *Gamboa*, 183 Wn.2d at 52 (quoting *Nw. Cities*, 13 Wn.2d at 87).

The trial court's findings support its conclusion that the Neighbors overcame the presumption of permissive use because they establish that the Neighbors' use of the turnouts was adverse. The Larsons place significance on the Kings' reasons for placing the rocks in the turnouts, and that no evidence showed that they were trying to exclude the Neighbors in particular. However, the Neighbors need only provide evidence that they interfered with the owner's use of

---

[6] The trial court applied the presumption by finding that the parcels upon which the road and turnout areas lie were unenclosed and, other than the road, undeveloped. The Larsons seem to contend that while the trial court correctly applied the presumption, it erred by concluding that the Neighbors overcame the presumption.

the property "in some manner" in order to show adverse use and overcome the presumption. *Gamboa*, 183 Wn.2d at 52.

Here, the findings established that John King Sr. placed the rocks in the turnout areas and the Neighbors directly interfered with the Kings' use of the turnouts in some manner when they removed the rocks and continued to use the areas as turnouts. The findings also established that the Kings had knowledge of this interference because the rocks were placed in the turnouts as an effort to block access, either by their father John King Sr. or his maintenance staff, and were not replaced once moved. John King Sr. was aware that the Neighbors were using the turnout areas because he knew that two vehicles could not pass each other on the road.

We, therefore, conclude that the trial court's findings support its conclusions of law.

## II. EXPRESS EASEMENT

The Larsons argue that the trial court erred by "expanding" the scope of the express easement because its conclusion is unsupported by the law or facts. Br. of Appellant at 22. They argue that the trial court erroneously found the express easement to be ambiguous, and thereby erroneously prohibited the construction of a fence or structure within 2 1/2 feet of the road. The Larsons also argue that the trial court erroneously interpreted the easement based on the Neighbors' need, rather than the Neighbors' intent. We disagree.

A.    SUBSTANTIAL EVIDENCE

The Larsons assign error to a number of the trial court's findings of fact and conclusions of law relevant to this issue.[7]  We again note that some of the challenged findings of fact or portions of those findings of fact address legal conclusions.  As discussed above, we treat such findings as conclusions of law and review them accordingly.  *Para-Med. Leasing*, 48 Wn. App. at 397.[8]

Here, substantial evidence exists to support the trial court's findings that a fence or structure built closer than 2 1/2 feet from the edges of the road would interfere with the use of the

---

[7] The Larsons also challenge conclusion of law 6.  That conclusion states that an unpublished Tennessee Court of Appeals case, *Carroll v. Belcher*, No. 01A01-9802-CH-00106, 1999 WL 58597 (Tenn. Ct. App. Feb. 9, 1999) is instructive on the issue regarding the scope of the express easement.  The Larsons argue that the court's reliance on the case was misplaced.

Although the case is neither binding nor precedent, the trial court properly cited to it.  *See* GR 14.1(b) (authorizing citation to unpublished decisions from out-of-state jurisdictions); Tennessee Court of Appeals Rule 12 (authorizing citation to unpublished decisions).  *Carroll* is persuasive.  Its facts are similar to the ones in the case before us.

In *Carroll*, the court enjoined the servient estate from erecting a fence within two feet along the border of a long, curving 8-10 foot-wide road easement.  1999 WL 58597, at *1, 5.  It held that the servient estate owner could not unduly interfere with the lawful use of an easement held by the dominant estate holder.  *Carroll*, 1999 WL 58597, at *4.  The terrain surrounding the easement was wooded and the easement was not straight; it was, therefore, difficult to drive a vehicle on it without hitting the fence.  *Carroll*, 1999 WL 58597, at *5.  While it declined to expand the width of the easement, the court held that erecting a fence within two feet of the easement's edges would materially interfere with the use of the easement.  *Carroll*, 1999 WL 58597, at *5.

*Carroll*'s reasoning is also consistent with Washington law.  *See Nw. Properties Brokers Network, Inc. v. Early Dawn Estates Homeowner's Ass'n*, 173 Wn. App. 778, 792-93, 295 P.3d 314 (2013) (servient estate owner may reasonably restrict use of an easement, e.g. erect a gate on the easement, but the restriction cannot unreasonably interfere with the dominant estate owner's use).

[8] Additionally, we do not review some of the challenged findings because they relate to a claim that was dismissed and because they are irrelevant to the issues in this appeal.  Nor do we review any challenged findings that are unsupported by substantive argument.  *Satomi, LLC*, 167 Wn.2d at 808.

11

road. The unchallenged findings established that the road was used by the Neighbors' families for years, and with many vehicles. Such vehicles included emergency service vehicles.

The letter from the fire department also established that the local fire departments' fire engines and ambulances are both 8 feet 6 inches wide. With the doors open to access equipment, the emergency vehicles are at least 10 feet wide. The letter also expressly stated that, "[d]ue to the curves in the road and the design of the vehicles, if a fence is built along [the] entire easement road, [the fire department] would not be able to take either an engine or ambulance down that road without destroying the fence and severely damaging [its] apparatus." Ex. 47, at 1.

The chief of the fire department also testified that the Pierce County Fire Marshal's Office required 15 feet of airspace to maneuver any road. On the road at issue, the fire department would need 2 1/2 feet of space on either side of the road to maneuver their vehicles.

Because there is a quantum of evidence sufficient to persuade a rational fair-minded person the findings are true, we conclude that substantial evidence supports the critical challenged findings. The Larsons challenge other findings of fact. Although we do not discuss them in detail, the record provides substantial evidence to support all of them. We conclude the Larsons' argument on this issue to be without merit.

B.   CONCLUSIONS OF LAW

The scope of an easement is determined by examining the parties' intent when the easement was originally created. *Nw. Props. Brokers Network, Inc. v. Early Dawn Estates Homeowners Ass'n*, 173 Wn. App. 778, 789-90, 295 P.3d 314 (2013). The interpretation of an easement is a mixed question of law and fact. *Sunnyside*, 149 Wn.2d at 880. What the original parties intended is a question of fact, and the legal consequence of that intent is a question of law. *Sunnyside*, 149 Wn.2d at 880.

12

The original parties' intent is determined from the easement agreement as a whole. *Sunnyside*, 149 Wn.2d at 880. If the plain language is unambiguous, extrinsic evidence is not be considered. *Sunnyside*, 149 Wn.2d at 880. If the agreement is ambiguous, "extrinsic evidence is allowed to show the intentions of the original parties, the circumstances of the property when the easement was conveyed, and the practical interpretation given the parties' prior conduct or admissions." *Sunnyside*, 149 Wn.2d at 880. The same principles apply when an easement is silent on some points: the rules of construction call for an examination of the situation of the property, the parties, and the surrounding circumstances. *Nw. Props. Brokers*, 173 Wn. App. at 792.

The trial court's findings support its conclusions that the 1996 express easement is ambiguous as to whether a fence or structure might interfere with the purpose of the easement, and structures built closer than 2 1/2 feet from the edges of the road would materially interfere with the use and purpose of the road because it would preclude large vehicles from using the road.

On its face, the express easement was silent as to whether a fence or structure built along or near the road would interfere with the purpose of the express easement. The rules for interpreting an ambiguous easement apply when the easement is silent on an issue. *Nw. Props. Brokers*, 173 Wn. App. at 792. The trial court correctly ruled that the easement was ambiguous.

Due to the ambiguity in the easement, the trial court correctly looked at extrinsic evidence to determine the intentions of the original parties. It examined the property, the parties, and the surrounding circumstances. *Nw. Props. Brokers*, 173 Wn. App. at 792. The evidence showed that the intention of the original parties in creating the easement was to confirm the historical use of

the private road. In other words, it provided ingress and egress for themselves and others, including friends, delivery service, and emergency service vehicles. A formal easement agreement was created because the Watermeyers' lender required such an agreement confirming access rights to their property before they were able to close on their home.

The trial court properly examined the locations of the Neighbors' properties; the physical attributes of the road, including curvature and length; the parties' historical use of the road, including the use of emergency vehicles and other large vehicles; and the surrounding circumstances to determine the parties' intent and the easement's purpose. In particular, it examined the size of emergency service vehicles and other large vehicles that used the road to determine that a fence or structure built along the road would materially interfere with the use of the road. Based on the evidence presented, the court reasonably interpreted the express easement to conclude that a minimum of 2 1/2 feet of space was needed for the Neighbors to use the road in a manner consistent with the use and purpose of the easement.

In so ruling, we do not construe the trial court's conclusions as an "expansion" of the express easement. The trial court clearly concluded that the restriction on the construction of a fence or structure within the stated distance of the easement "does not expand the [10-foot] width of the surface easement area." CP at 1436. Its conclusion did not involve an expansion of the express easement.

We, therefore, conclude that the trial court's findings support its conclusions of the law.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur;

Bjorgen, C.J.

Sutton, J.