
COURT OF APPEALS DIV
STATE OF WASHINGTO

2013 OCT -7 AH 9: 25

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of | NO. 69126-1-I |
| T.M.S. (DOB 8/9/2007)<br>C.A.M. (DOB 10/14/2008) | (CONSOLIDATED WITH<br>NO. 69127-9-I) |
| Minor Children. | DIVISION ONE |
| REBEKKA MCCRAY, | UNPUBLISHED OPINION |
| Appellant, | |
| v. | |
| DEPARTMENT OF SOCIAL<br>AND HEALTH SERVICES, | |
| Respondent. | FILED: October 7, 2013 |

LEACH, C.J. — Rebekka McCray appeals the trial court's termination of her parental rights to her two sons, T.M.S. and C.A.M. She claims that the trial court violated her due process rights when it found that the Department of Social and Health Services (Department) offered or provided all necessary services capable of remedying her parental deficiencies, that McCray is currently unfit to parent her sons, that there was little likelihood conditions will be remedied so that her sons can be returned to her in the near future, and that terminating her parental rights was in her sons' best interests. Because substantial evidence supports the trial court's findings, we affirm.

FACTS

Rebekka McCray is the mother of T.M.S., born August 9, 2007, and C.A.M., born October 14, 2008. T.M.S. has special needs, including an adjustment disorder, an attachment disorder, and an anxiety disorder, and he demonstrates aggressive behavior. C.A.M. also has special needs that include an adjustment disorder and posttraumatic stress disorder. Additionally, he demonstrates aggressive behavior and suffers from speech delays. McCray, who was 14 and 15 years old when T.M.S. and C.A.M. were born, was a dependent child who ran away from her court-ordered placement seven or eight times. She used marijuana while pregnant with her children. The boys' father, Tramein Slack Sr., physically, verbally, and sexually abused McCray.

The State removed T.M.S. and C.A.M. from their parents' care on November 10, 2008. The State offered McCray a number of services on a voluntary basis to remedy her parental deficiencies, including random urinalysis, a drug/alcohol evaluation, domestic violence services, mental health counseling, parenting education, and public health nurse services. After McCray failed to participate in these services, the Department filed a dependency petition as to both children.

The trial court entered an agreed order of dependency for T.M.S. and C.A.M. as to McCray on March 27, 2009. In the dependency disposition order, McCray agreed to engage in a number of services to remedy her parental deficiencies, including a drug/alcohol evaluation and recommended treatment, random urinalysis, domestic violence support groups,[1] individual mental health counseling, and parenting classes.

After the court entered the orders of dependency, the Department offered McCray drug/alcohol evaluations and treatment. In January 2009, McCray had a drug/alcohol evaluation at Central Youth and Family Services, which diagnosed her with cannabis dependency and alcohol abuse and recommended intensive outpatient treatment. McCray was transported to the PTS Fresh Start drug treatment program in February and May 2009. She refused to complete the intake in February and abandoned the program after six days in May. McCray failed to appear for an intake with Northeast Treatment Alternatives in 2010. In January 2011, she had a second drug/alcohol evaluation at New Traditions, which recommended intensive outpatient treatment. After McCray failed to follow through with this treatment, she obtained a third drug/alcohol evaluation in September 2011 at Washington Asian-Pacific Islander Families Against Substance Abuse (WAPI). This agency diagnosed her with cannabis

---

[1] The court removed this requirement on November 7, 2011.

dependence and recommended intensive outpatient treatment. Although McCray started this treatment, she abandoned the program in April 2012.

The Department offered McCray random urinalysis testing with Sterling Reference Laboratories, It Takes a Village Family Services, U.S. Healthworks, and WAPI. McCray did not engage in random urinalysis testing until September 2011. She participated in this testing until April 2012. Each urine sample tested positive for marijuana, indicating ongoing and consistent use. On April 10, 2012, during an unannounced visit, the children's caseworker, Jennifer Johnson, smelled marijuana at McCray's home and found a marijuana pipe on a bathroom countertop.

The Department referred McCray to Navos, Spokane Mental Health, and Southeast Youth and Family Services (SEYFS) for individual mental health counseling. She appeared for an intake with Spokane Mental Health in April 2010, where she received diagnoses of major depressive disorder and posttraumatic stress disorder. Spokane Mental Health discharged her after she did not return for treatment, but she enrolled in services again in June 2010. She engaged in services until October 2010, when she abandoned this treatment. McCray participated in services with SEYFS beginning in September 2011. She received diagnoses of major depressive disorder and posttraumatic stress

disorder, and a rule-out diagnosis of cannabis abuse. McCray abandoned this treatment after February 23, although she attended one session in April. She also stopped seeing the agency's medication provider.

The Department also referred McCray to the YWCA's domestic violence victim's services. Although she engaged in only one class, her counselor at SEYFS also provided services related to domestic violence. McCray continued her abusive relationship with Slack throughout the dependency until September 2011, when she entered into another abusive relationship that lasted for eight months.

McCray completed parenting classes at SEYFS. Although McCray repeatedly ran away from foster care placement, the trial court concluded that her "current housing is appropriate."

On March 2, 2012, the court permitted McCray to participate in her children's therapy. She failed to attend each of two scheduled sessions. The Department referred McCray to Esther Patrick for parent coaching with the expectation that Patrick would also use parent-child interactive therapy (PCIT) techniques. McCray engaged in services with Patrick from January 2012 until April 2012. The Department terminated these services in April 2012.

Although the Department provided McCray with transportation services, she failed to visit the children consistently between January 2009 and September 2011. In August 2011, she requested to recommence visitation, but the Department did not set up the visitation until November. McCray visited her children four times per week until January 2012, after which she visited them only twice per week.

The Department filed a petition for termination of the parent-child relationship on August 19, 2011. Because McCray demonstrated progress in her court-ordered services from September 2011 until April 2012, the trial court continued the termination proceeding to allow her to make further efforts toward reunification. In December 2011, the court ordered, and McCray agreed, that she needed to make "substantial progress."

The termination proceedings began on June 18, 2012. On July 6, 2012, the King County Juvenile Court entered an order terminating McCray's parental rights. In the order, the court made specific findings, including the following disputed findings:

> 2.30 RCW 13.34.180(e)(ii) applies to the mother.
> . . . .
> 2.37 The mother's judgment with regards to appropriate relationships is impaired. . . . The mother has maintained these relationships in spite of support and assistance received by the mother in learning how to protect herself, and her children, from abusive partners and friends.

. . . .

2.40 Although the mother demonstrates that she loves her children during visitation, the mother has difficulty managing the children's behaviors, setting limits, and consistently addressing the children's needs, as observed by Esther Patrick (the parent-child interactive therapy provider), Paula Solomon (the [Foster Care Assessment Program] evaluator), the CASA [court appointed special advocate], and visit supervisors.

. . . .

2.46 The mother will not be able to remedy her parental deficiencies in the children's near future. Services ordered under RCW 13.34 have been expressly and understandably offered or provided and all necessary services reasonably available, capable of correcting the parental deficiencies within the foreseeable future, have been expressly and understandably offered or provided to the mother. Neither the Department's delay in setting up visitation after the mother reappeared in late August 2011 nor the delay/missed notification of child therapy appointments support a contrary conclusion. While the children and mother are affectionate and love each other, before mother reappeared in August 2011, the mother had repeatedly terminated contact with the children in an abrupt fashion, and for lengthy periods. After the Department set up visits in November, mother was offered visitation services four times per week but chose to only exercise visits twice per week. The Department also agreed to continuances of the termination trial to allow mother additional time to make progress in her services. The relatively brief delay in offering these services did not affect mother's most significant deficiencies. She is not capable of providing a safe environment for the children, proper structure or effective discipline because of her serious untreated mental health issues compounded by her drug dependency, compounded by the children's special needs. More contact with the children or exposure to appropriate parent-child therapy would not have corrected these deficiencies.

. . . .

2.49 The mother has failed to substantially improve her parental deficiencies in the thirty-nine months following the entry of

the disposition order. Pursuant to RCW 13.34.180(1)(e), the rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned [to] the mother in the near future applies, and the mother has not rebutted the presumption.

. . . .

2.53 Rebekka Faith McCray is currently unfit to parent [C.A.M.] and [T.M.S.].

2.54 Termination of the parent-child relationship between Rebekka Faith McCray and [C.A.M.] and [T.M.S.] is in the best interest of the children.

McCray appeals.

## STANDARD OF REVIEW

The United States Constitution protects parental rights as a fundamental liberty interest.[2] To terminate a parent's rights, the Department must satisfy a two-pronged test.[3] The first prong requires that the Department prove by clear, cogent, and convincing evidence[4] the six factors enumerated in RCW 13.34.180(1).[5] The second prong requires the Department to prove by a preponderance of the evidence[6] that termination is in the child's best interests.[7]

---

[2] Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

[3] In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011).

[4] K.N.J., 171 Wn.2d at 576-77.

[5] K.N.J., 171 Wn.2d at 576. RCW 13.34.180(1) requires the State to prove (a) the child has been found to be a dependent child; (b) the court has entered a dispositional order pursuant to RCW 13.34.130; (c) the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency; (d) the services rendered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

We consider the facts and circumstances of each individual case to determine the child's best interests.[8] This court places a "'very strong reliance on trial court determinations of what course of action will be in the best interests of the child.'"[9] "[A] child has the right to basic nurturing, which includes the right to a safe, stable, and permanent home and the speedy resolution of dependency and termination proceedings."[10] If the child's rights conflict with the parent's rights, the child's rights should prevail.[11]

We will uphold the trial court's factual findings if substantial evidence supports them.[12] "'[E]vidence is substantial if, when viewed in the light most favorable to the party prevailing below, it is such that a rational trier of fact could

---

(e) there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and (f) continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

[6] In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).

[7] RCW 13.34.190(1)(b).

[8] In re Dependency of A.V.D., 62 Wn. App. 562, 572, 815 P.2d 277 (1991) (citing In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980)).

[9] In re Pawling, 101 Wn.2d 392, 401, 679 P.2d 916 (1984) (quoting In re Welfare of Todd, 68 Wn.2d 587, 591, 414 P.2d 605 (1966)).

[10] In re Dependency of T.R., 108 Wn. App. 149, 154, 29 P.3d 1275 (2001) (citing RCW 13.34.020).

[11] RCW 13.34.020.

[12] In re Dependency of K.D.S., 176 Wn.2d 644, 652, 294 P.3d 695 (2013) (citing Aschauer, 93 Wn.2d at 695).

find the fact in question by a preponderance of the evidence.'"[13] In determining whether substantial evidence supports the court's findings, we do not weigh the evidence or the credibility of witnesses.[14] "Deference paid to the trial judge's advantage in having the witnesses before him is particularly important in deprivation proceedings."[15]

## ANALYSIS

McCray's identified parental deficiencies include chemical dependency, mental health issues, inability to protect herself and her children from domestic violence, and difficulty managing her children's behavioral challenges, setting limits, and consistently addressing the children's needs. McCray alleges that the trial court violated her due process rights when it found her unfit to parent T.M.S. and C.A.M. and terminated her parental rights because the Department failed to prove two of the six required factors: "that it provided all services necessary to remedy Ms. McCray's parental deficiencies" under RCW 13.34.180(1)(d), and that "there was little likelihood that conditions would be remedied" under RCW 13.34.180(1)(e). Additionally, she claims, "[T]he juvenile court's consideration of

---

[13] In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003) (alteration in original) (quoting In re Dependency of M.P., 76 Wn. App. 87, 90-91, 882 P.2d 1180 (1994)).

[14] E.L.F., 117 Wn. App. at 245 (citing In re Welfare of Sego, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973)).

[15] Aschauer, 93 Wn.2d at 695.

the children's 'best interests' was premature and in error." We reject McCray's

contentions.

RCW 13.34.180(1)(d) requires the Department to prove "[t]hat the services

ordered under RCW 13.34.136 have been expressly and understandably offered

or provided and all necessary services, reasonably available, capable of

correcting the parental deficiencies within the foreseeable future have been

expressly and understandably offered or provided." To meet this burden, the

Department must show that it offered McCray all of these services and that it

tailored the proffered services to her needs.[16] When the Department suggests

remedial services to a parent, it must, at a minimum, provide the parent with a

referral list of agencies or organizations that provide the services.[17] But a

parent's unwillingness or inability to use the services provided excuses the

Department from offering extra services that might have been helpful.[18]

McCray asserts, "The failure of the Department to coordinate services

between the social worker and the drug treatment provider is . . . a failure of

services." She also alleges that the Department "frustrated" her efforts to make

substantial progress because "[a]lthough the Department knew that Ms. McCray

---

[16] T.R., 108 Wn. App. at 161 (citing In re Dependency of P.D., 58 Wn. App. 18, 29, 792 P.2d 159 (1990)).
[17] In re Welfare of Hall, 99 Wn.2d 842, 850, 664 P.2d 1245 (1983).
[18] T.R., 108 Wn. App. at 163 (citing In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988)).

was eager to begin resumed visitation with her children beginning in August of 2011, the Department admitted that resumed visitation did not commence until November of 2011." McCray argues that this delay had a "material affect [sic] on the mother's ability to cure her deficiencies so as to establish a likelihood of possible reunification."

Lynett Mitchell, a drug treatment counselor at WAPI, testified at the termination proceedings that she worked with McCray to create a treatment plan "to have her stop using marijuana altogether." The plan involved a "gradual step-down," with the goal "to decrease the usage by a day to two days every several weeks." Although Mitchell made phone calls, left voice messages, and sent a reengagement letter, McCray did not return to this treatment after April 5, 2012, with no explanation. Additionally, Mitchell testified that McCray's urinalysis results showed she had decreased but then increased her marijuana usage. Mitchell further stated that McCray knew she had to stop using marijuana "to parent her children appropriately."

McCray's mental health therapist, Susan Sakomoto, testified that from September 2011 until December 2011 McCray "was showing up on a fairly regular basis. She was—seemed motivated to make change." But she also stated that McCray continuously missed appointments after February 23, 2012,

and that McCray attended only one appointment after that date, despite Sakomoto's voice mails encouraging her to return. Sakomoto further testified that "based on McCray's attendance and engagement" with Sakomoto from March through the time of the termination proceedings, McCray was not making progress toward addressing her mental health issues. McCray testified that she knew where to go to attend mental health counseling and drug/alcohol treatment.

On April 10, 2012, after Department social worker Jennifer Johnson smelled marijuana and found a pipe in McCray's home, McCray explained that she "relapsed about a week and a half ago." McCray claims, "[T]he Department, evidently unaware of the treatment plan that Ms. Mitchell had recommended, and was providing, concluded that an instance of use of marijuana disqualified Ms. McCray from all services and all hope of reunifying with her children." She asserts that her drug treatment provider "had not counseled the mother to immediately become abstinent from marijuana, and she was making documented progress in her course of treatment."

Substantial evidence supports the trial court's finding that the Department satisfied the requirements of RCW 13.34.180(1)(d). McCray does not demonstrate that the Department "fail[ed] to adequately inform the mother of the plan that outlines her responsibility during dependency." Her urinalysis results

-13-

reveal that she recently increased her marijuana usage, even though she participated in developing the treatment plan to reduce her usage. McCray also terminated efforts to address her mental health issues. She provides no reason for abandoning her mental health counseling or her chemical dependency treatment.

The Department discontinued or chose not to implement particular services after McCray stopped engaging in services to address her mental health and drug dependency issues. Johnson testified that the Department did not believe family preservation services, public health nurse services, or other in-home services were appropriate because "they would've been most appropriate at a point in which we could say the children were returning to their mother's care imminently." The Department also terminated McCray's PCIT. Johnson testified,

> Currently the mother still has a ways to go in order to manage her children's behaviors, behavioral challenges. She appears to have unresolved chemical dependency use and/or abuse, and she appears to be in denial about the impacts of that use on the ability to parent efficiently; more specifically, the ability to parent her particular children with their particular needs.
> She's no longer engaged in critical services that she's repeatedly expressed that she absolutely could benefit from. She's disengaged from them.

Catherine Brewe, the children's therapist, testified that PCIT was not appropriate because "[t]he guidelines for PCIT are that it is to be done only in situations

-14-

where the child is in the custody of the parent that you're working with, or is going to have imminent return of the child," which was not the case here.

The children's therapist from Navos, Mysti Coccia-Eddy, testified that she stopped working with McCray after two missed appointments and returned to working with the foster parent "[b]ecause I hadn't seen [C.A.M.], because I was only doing dyadic work with him. I had not seen him for three weeks, and it was a, you know, abrupt disruption in therapy, and I felt like continuation of services was paramount." The record shows that although McCray did not receive notice of the first appointment, she received phone messages from Johnson and Coccia-Eddy notifying her of the second appointment. The Department "concedes that there were some communication issues around parent coaching and PCIT," but it nevertheless offered services appropriately to correct her primary parental deficiencies, including mental health and drug treatment. While services such as PCIT might have improved McCray's parenting skills, her lack of stability and consistent engagement with the proffered services support the court's conclusion that "[m]ore contact with the children or exposure to appropriate parent-child therapy would not have corrected" her inability to provide an appropriate environment for T.M.S. and C.A.M.

McCray fails to show how the delay in resuming visitation in 2011 contributed to her inability to remedy her key parental deficiencies. And despite her argument, visitation "does not, on its own, correct parental deficiencies to enable the parent to resume custody, and thus, . . . it is not a 'service' that must be provided under RCW 13.34.180(1)(d)."[19] Therefore, this delay is insufficient to establish that the trial court erred in finding that the Department met its burden of proof regarding the services element.

McCray also claims that the trial court erred when it found that RCW 13.34.180(1)(e)(i) and (ii) apply to her. Under RCW 13.34.180(1)(e), to terminate parental rights, the Department must prove

> [t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided. In determining whether the conditions will be remedied the court may consider, but is not limited to, the following factors:
> (i) Use of intoxicating or controlled substances so as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the

---

[19] In re Dependency of T.H., 139 Wn. App. 784, 792, 162 P.3d 1141 (2007).

parent to receive and complete treatment or documented multiple failed treatment attempts;

(ii) Psychological incapacity or mental deficiency of the parent that is so severe and chronic as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documentation that there is no treatment that can render the parent capable of providing proper care for the child in the near future.

RCW 13.34.180(1)(e) focuses on "whether the identified deficiencies have been corrected."[20]

The trial court based its conclusions on its findings that McCray received diagnoses of cannabis dependency and alcohol abuse and also major depressive disorder and posttraumatic stress disorder. The court entered an order of dependency on March 27, 2009. Because we conclude that the Department clearly offered or provided "all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future," and no evidence shows that McCray was able to "substantially improve parental deficiencies within twelve months following entry of the dispositional order," we presume "that there is little likelihood that conditions will be remedied so that the child[ren] can be returned to the parent in the near future."[21] Because this implicates McCray's constitutional rights, this presumption shifts the burden of

---

[20] In re Welfare of M.R.H., 145 Wn. App. 10, 27, 188 P.3d 510 (2008) (citing In re Dependency of K.R., 128 Wn.2d 129, 144, 904 P.2d 1132 (1995)).
[21] RCW 13.34.180(1)(e).

production to McCray, while the Department maintains the burden of persuading this court that it is highly probable McCray would not improve in the near future.[22] McCray fails to rebut this presumption.

Additionally, "a parent has a constitutional due process right not to have his or her relationship with a natural child terminated in the absence of a trial court finding of fact that he or she is currently unfit to parent the child."[23] Here, the trial court found that "Rebekka Faith McCray is currently unfit to parent [C.A.M.] and [T.M.S.]."

McCray alleges that she "had been honest with the Department regarding her marijuana use, including by taking UA's [urinalysis] which were positive, and by the time of the termination trial she had been successfully off of marijuana for over a month." Mitchell testified that McCray's marijuana use caused irritability and an inability to sleep. Additionally, McCray suffered withdrawal symptoms such as sadness and anger when she stopped using the drug. Further, Mitchell testified that McCray used marijuana while taking prescription medication for anxiety and depression, which could exacerbate her mental health symptoms and also pose a physical risk to her.

---

[22] In re Welfare of C.B., 134 Wn. App. 942, 955-56, 143 P.3d 846 (2006) (citing 2 McCORMICK ON EVIDENCE § 344, at 445 (John W. Strong ed., 5th ed. 1999)).

[23] A.B., 168 Wn.2d at 920.

McCray provides no objective evidence of her sobriety, only her own testimony. Her random urinalysis tests revealed that she had not decreased her marijuana usage by April 2012, when she stopped participating in drug treatment and the random urinalysis testing. During the termination proceedings, she could not state a reason for ending her treatment with Mitchell.

McCray also argues that Sakomoto

> confirmed two important facts—that Ms. McCray worked with her to make a change in her mental health medications that was extremely beneficial in eliminating the symptoms of Depression and PTSD [posttraumatic stress disorder] that she had experienced as an adolescent and when she was on a different regimen [and] that Ms. McCray was honest with her regarding her marijuana use, so that Sakomoto could advise her regarding the risks.

McCray experienced irritability, crying spells, nightmares, flashbacks, insomnia, low appetite, and fatigue. Again, Sakomoto testified that "based on McCray's attendance and engagement" with Sakomoto from March through the time of the termination proceedings, McCray was not making progress toward addressing her mental health issues.

Johnson testified that McCray "may have been lethargic and/or under the influence of either prescription or non-prescribed controlled substances" during a visit with T.M.S. and C.A.M. Johnson expressed "current concerns about some of the convenient visitation narratives, specifically one that depicted a mother that was lethargic, failing to respond to very high-needs children, who appeared less

than ready to engage and interact with her kids during a visit." She stated that even though McCray's visits with her children in a controlled environment with supervision were positive and consistent, "parenting involves making sure that you meet other responsibilities as far as providing the basic needs for your children, ensuring that, you know, you're in compliance with whatever conditions are wrapped around their placement, even if that's home." She added, "The mother's totally disengaged from critical services in this case that influenced the need for the dependency at the very beginning."

The period of time constituting the foreseeable future depends in part on the children's age.[24] "A matter of months for young children is not within the foreseeable future to determine if there is sufficient time for a parent to remedy his or her parental deficiency."[25] At the termination proceeding, a Foster Care Assessment Program evaluator, Paula Solomon, testified about her reunification assessment. To conduct the assessment, Solomon spoke with McCray, Johnson, Coccia-Eddy, Sakamoto, Mitchell, the foster parent, and the Childhaven case manager, Kristin Wells. Solomon also reviewed McCray's Division of Child and Family Services case files, including notes from McCray's

---

[24] In re A.W., 53 Wn. App. 22, 32, 765 P.2d 307 (1988).

[25] M.R.H., 145 Wn. App. at 28 (citing Hall, 99 Wn.2d at 850-51 (eight months not in foreseeable future of four-year-old); A.W., 53 Wn. App. at 31-32 (one year not in the foreseeable future of three-year-old); P.D., 58 Wn. App. at 27 (six months not in the near future of 15-month-old)).

drug and alcohol and mental health treatment providers. She testified that McCray "had made good progress" but would need further services before she could parent her children safely. She also stated that the fact the children were dependent for most of their lives and "had multiple moves and disruptions," as well as their "current state of not having permanency," was impacting their functioning. Solomon explained, "[G]iven how far into the children's dependency and time and care, and given Ms. McCray's current functioning, involvement in services, and ability, that reunification is not recommended." She stated that the children need a permanent home and that "at this current point now," she did not believe the children could wait another three months or six months to see whether McCray could demonstrate "a significant period of stability, sobriety."

McCray has failed to demonstrate that she has adequately improved her parental deficiencies. Substantial evidence shows that McCray's marijuana use and mental health issues render her incapable of providing proper care for her children for periods of time that present a risk of imminent harm to them. The record also shows a documented unwillingness to receive and complete treatment. Therefore, we hold that substantial evidence shows McCray is unfit to parent T.M.S. and C.A.M. and also demonstrates little likelihood that conditions

will be remedied in the near future to enable T.M.S. and C.A.M. to be returned to McCray.

McCray also disputes the trial court's determination that termination is in T.M.S.'s and C.A.M.'s best interests because "[t]he evidence was that Ms. McCray was loved by her children and loved them back, and they were always happy to see her." To support her argument, McCray states that after becoming concerned about her children's hygiene while the children were in foster care, she put lotion and petroleum jelly on their skin and cleaned their ears during the visitation sessions and sent them shoes that fit properly.

McCray does not dispute the trial court's finding of fact 2.55:

> Permanency for these children is long overdue. [C.A.M.] has spent all but one month of his life out of the care of his parents, and [T.M.S.] has spent 75% of his life out of the care of his parents. They need a resolution to these proceedings and cannot wait for the mother to stabilize and make progress in her services and in remedying her deficiencies.

She also does not dispute the court's finding of fact 2.50: "Continuation of the parent-child relationship between the children and their mother clearly diminishes the children's prospects for early integration into a stable and permanent home." Because she does not challenge these findings, they are verities on appeal.[26]

---

[26] Nw. Props. Brokers Network, Inc. v. Early Dawn Estates Homeowners' Ass'n, 173 Wn. App. 778, 791, 295 P.3d 314 (2013) (citing Cowiche Canyon Conservancy v. Bosley, 118 Wn. 2d 801, 808, 828 P.2d 549 (1992)).

Further, she does not dispute the CASA's testimony that termination is in the children's best interests "[b]ecause the children have been in foster care for three and a half years, which is too long for any child. . . . And I think it's clearly not in their best interest to stay in foster care. And they have an opportunity for permanency now."

"When a parent has failed to rehabilitate over a lengthy dependency period, a court is fully justified in finding termination to be in a child's best interests rather than leaving the child 'in the limbo of foster care for an indefinite period' while the parent seeks further rehabilitation."[27] While McCray's actions demonstrate that she possesses some positive parenting skills, she has failed to show progress in addressing her parental deficiencies. Therefore, the preponderance of the evidence supports the trial court's best interests finding.

---

[27] In re Dependency of J.A.F., 168 Wn. App. 653, 670, 278 P.3d 673 (2012) (internal quotation marks omitted) (quoting T.R., 108 Wn. App. at 167).

## CONCLUSION

Because substantial evidence supports the trial court's termination

findings, we affirm.

_Leach, C. J._

WE CONCUR:

_Verellen, J._

_Cox, J._