# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CLARE LINN WELKER and ABIGAIL METZGER WELKER, trustees of the Big Sky Trust UDT 11-14-2002<br><br>Appellants,<br><br>v.<br><br>MOUNT DALLAS ASSOCIATION, a Washington non-profit corporation;<br><br>Respondents,<br><br>PETER and KIMBERLY ALBERT; TIMOTHY and SUSAN ALLEN; DAVID and NANCY AUTH; ANITA BAILOR; PATRICK and JOANN BALENGER; MICAJAH BIENVENU and AMY ANDERSON; CONSTANCE BLACKMER; HENRY J. BORYS and KESHA EWERS; JOHN and SHARON BOYD; PATRICIA T. CASEY; KYLE CHAPMAN and LADD JOHNSON; WENDY CRAWFORD; PETER DAVIS and SUSAN CRAMPTON DAVIS; CYNTHIA and MARK DEARFIELD; DAVID DUGGINS and MEGAN DETHIER; ROBERT T. EICHLER; ROBERT J. ERSKINE, JR. and PEGGY ERSKINE; JAMES L. and WENDY FRANCIS; JAMES FRITZ; GREG and JANE GERHARDSTEIN; GARY GERO; JAMES GIMLETT and MAGGIE GALLIVAN; CRAIG and JEAN GRAHAM; JAMES and MARY GUARD; NASH R. GUBELMAN and LINDA SOFTING-GUBELMAN; STERLING TRUST COMPANY FBO; THOMAS and COLLEEN HAVERMAN; | No. 78031-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: July 8, 2019 |

RONALD and ASHLEY HURST HENNEMAN; HENNEMAN IRREVOCABLE TRUST; LISA LYNN HILL; PAUL A. and JENNIFER HOHENLOHE; GLENN and DIANE KAUFMAN; FRED KEELER; JANE B. KROESCHE; GORDON LAGERQUIST; MAURICE and MOLLY LIEBMAN; MADRONA RIDGE, LLC; FLORENCE MCALARY; ROBERT and SARA MCCLELLAN; J. ROYCE MEYEROTT and LEE M. BRYAN; JEROME S. and ANN MOSS; MOSS TRUST; DIANNA PADILLA; MARK PRZYBYLSKI and MAUREEN KAY KOSHI; ROGER and JILL RATH; PATRICIA ROBERTS; BENJAMIN TROUTMAN and KARLA SABIN; THOMAS SCHILLING; FLORENT SCHOEBEL and JESSICA FARRER; ERIK and ELAINE SCHUMY; WILLIAM and LAURA SEVERSON; MARK SHEPPARD; FRED and ELEANOR SILVERSTEIN; SAN JUAN PRESERVATION TRUST; DONALD E. STRAUTON and MARIA SIKORSKI; GREGORY A. and JANE SWANSON; RIKKI SWIN; ROBERT TAUSCHER and SANDRA HAWLEY; JOHN TAYLOR; BRUCE D. TWOOMEY; CARTER and JENNIFER WHALEN; L. CURTIS WIDDOES; SILVERSTEIN-GERSTON MOUNT DALLAS, LLC; SP INVESTMENTS II, LLC,

Defendants,

PETER C. ALBERT and KIMBERLY N. ALBERT, a marital community; representing the owners of properties on Lower No-Name Road, Kiya Way, Tumac Road, Rockledge Road, Skylark Lane, Rascal Road, and Stormridge Road; SP INVESTMENTS II, LLC, a Washington limited liability company; MARK G. DEARFIELD and

2

CYNTHIA S. DEARFIELD, trustees of the DEARFIELD LIVINGTRUST; SLIVERSTEING-GERSTON MOUNT DALLAS, LLC, a Washington limited liability company; ROBERT TAUSCHER and SANDRA J. HAWLEY, a marital community; JAMES K. FRITZ, an unmarried person; PETER A. DAVIS and SUSAN CRAMPTON DAVIS, a marital community; GORDON F. LAGERQUIST, and unmarried person; MARK SHEPPARD, an unmarried person; JANE B. KROESCHE, believed to be an unmarried person; DIANA PADILLA, believed to be an unmarried person; JOHN W. BOYD and SHARON F. BOYD, a marital community; CONSTANCE G. BLACKMER, a married person; WILLIAM A. SEVERSON and LAURA SEVERSON, a marital community; KARLA K SABIN and BENJAMIN D. TROUTMAN, a marital community; VALERIE BODDINGTON NAVRATIL, and unmarried person; RIKKI KAY SWIN; MARICE LIEBMAN and MOLLY J. LIEBMAN, a marital community; FLORENCE A. MCALARY, an unmarried person, and JEAN ELIZABETH MCFARLAND, a married person as her separate estate as joint tenants with right of survivorship; ROBERT ERSKINE JR. and PEGGY R. ERSKINE, a marital community; GREGORY A SWANSON and JANE SWANSON, a marital community; JAMES TIMOTHY ALLEN and SUSAN DUFOUR ALLEN, a marital community; JOHN ROYCE MEYEROTT and LEE M. BRYANT, a marital community; PATRICK JAMES BALLENGER trustee of the Patrick James Ballenger Revocable Trust; DONALD E. STAUNTON and MARIA SIKORSKI, a marital community;

3

THOMAS EDWIN SIBERT and DIANA
LYNN SIBERT, a marital community;
JAMES L GUARD and MARY B.
GUARD, a marital community;
JEROME S. MOSS and ANN
HOLBROOK MOSS, trustees of the
Moss Trust; PAUL HOHENLOHE and
JENNIFER HOHENLOHE, trustees of
the Paul Hohenlohe and Jennifer
Hohenlohe Living Trust; KENNETH E.
SMITH; HENRY J. BORYS and
KEESHA EVERS, a marital
community; and FRED E. KEELER,

Cross Claim Defendants.

APPELWICK, C.J. — The Welkers brought a declaratory judgment action against Mount Dallas Association (MDA) after MDA informed all property owners that it would be billing them for road maintenance costs. The trial court found that all owners had an obligation to share in the costs of general maintenance and periodic resurfacing of the Road. The Welkers argue that the trial court exceeded its authority in selecting MDA's cost allocation method, ordering nonconsenting owners to pay into a reserve fund, and limiting voting rights to owners current on their assessment payments. They also argue that substantial evidence does not support the trial court's finding of fact regarding the assessment discount for owners of undeveloped properties. We reverse the cost allocation method and calculation of the discount for undeveloped properties, otherwise affirm, and remand to the trial court for further proceedings consistent with this opinion.

FACTS

Mount Dallas Road (the Road) is located on San Juan Island. The Road is 10,857 feet long, and is comprised of 6 stacked and exclusive easements. The

4

easements provide access to 84 benefitted properties owned by 60 different property owners.

The property owners have easement rights over the Road for ingress, egress, and utilities to their respective properties from West Side Road. They have the legal right to use the Road from West Side Road to the end point of their respective easement. Depending on where their property lies, the end point of their respective easement may be located further up the Road than where their property's boundary line intersects the Road.

None of the easements set forth a method for allocating maintenance and repair costs for the Road. In 1989, a group of property owners formed a nonprofit corporation, the Mount Dallas Association (MDA), for that purpose. MDA was "organized exclusively for civic improvement, road maintenance, and neighborhood beautification purposes."

MDA is a voluntary association, meaning membership is optional. Owners of properties with a right to use the Road are entitled to membership, but are not required to join MDA. Between 1989 and 2015, MDA raised over $500,000.00 in voluntary contributions from property owners, all of which has or will be spent on maintaining and improving the Road. More recently, in 2005, MDA raised approximately $127,000.00 to chip-seal two miles of the Road. In 2011, MDA raised another $100,000.00 to resurface the Road.

Abigail Welker and her husband, Clare Welker, are trustees of the Big Sky Trust UDT 11-14-2002 (the Trust). The Trust owns two contiguous parcels of land on San Juan Island, which the Welkers access via the Road. The parcels are

5

located 5,455 feet up the Road from West Side Road. The Welkers previously served on MDA's board of directors. Clare[1] served as secretary for one month in 2011, and Abigail served as treasurer for four months in 2014.

In April 2015, in response to this court's decision in Buck Mountain Owners' Association v. Prestwich, 174 Wn. App. 702, 308 P.3d 644 (2013), MDA wrote to all benefitted property owners, indicating that it would be billing them for their "fair share" of road maintenance costs. It stated that Washington law "says that all owners of property on a private road for which they have easement access must pay an equitable/fair share of the road maintenance whether or not a road maintenance agreement exists." It further explained,

> Buck Mountain Association (located on Orcas Island) was in the same situation as Mount Dallas Road Association in that the road was constructed, easements granted, but no road maintenance obligations were imposed upon the parties who benefited from the use of the road. So just like us, Buck Mountain had owners who refused to pay their fair share.

MDA stated that "[f]air share is to be based on the length of the road that the owner uses."

On June 3, 2015, the Welkers filed a declaratory judgment action against MDA and all individuals who owned property accessed via the Road.[2] In their first claim for relief, the Welkers sought a declaratory judgment that

---

[1] We use first names for clarity.

[2] The Welkers' original complaint is not in the record. They amended their complaint on October 21, 2016, and June 30, 2017. Because the amended complaints did not include all of the defendants in the caption, and because MDA's first amended answer naming cross claim defendants did not include the cross claim defendants in the caption, and because the trial court included a caption naming some defendants but no cross claim defendants, we do not have a complete caption in the record.

(i)    The Association has no authority to establish and enforce a road maintenance agreement, or any maintenance and assessment methodology which is not adopted and agreed to by all Benefitted Property Owners;

(ii)    The Association has no authority to assess maintenance costs against the Benefitted Properties; and

(iii)    The Association has no authority to collect or pursue collection of maintenance costs from the Benefitted Property Owners.

In their second claim for relief, the Welkers sought a declaratory judgment that "establishes a reasonable, fair and equitable method of allocation of the expenses for the maintenance of Mt. Dallas Road (the 'Expense Allocation Method')." They also sought a declaratory judgment that "the Owners of Benefitted Properties allocated a majority of the expenses for the maintenance of Mt. Dallas Road under the Expense Allocation Method are authorized to maintain Mt. Dallas Road in accordance with the Expense Allocation Method."

In February 2016, the Welkers filed a motion for partial summary judgment, asking the trial court to "establish a method for allocating road maintenance expenses." They proposed two allocation methods, the actual use method and the legal use method. Under the actual use method, benefitted parcels would pay for the portion of the Road that they actually use. Under the legal use method, they would pay for the portion of the Road that they have the legal right to use. The Welkers argued that the legal use method "present[ed] the clearer, more reasonable, and more equitable solution." MDA filed a cross motion, seeking allocation based on the actual use method.

7

The trial court denied the Welkers' motion and granted MDA's motion. It found,

> For allocating road maintenance and repair expenses among the owners of parcels accessed via Mount Dallas Road, a method of proration based upon the length of the road actually used by each such parcel (the Actual Use Method) is more fair and equitable than one based upon the length of the road legally available by easements benefitting each such parcel (the Legal Use Method).

In December 2016, MDA and defendant L. Curtis Widdoes, Jr., a property owner, filed a second amended motion for partial summary judgment.[3] MDA and Widdoes asked the trial court to rule as a matter of law that

> A. The MDA is the proper managing entity for Mount Dallas Road.
> B. The MDA's Road Maintenance Agreement for Mount Dallas Road is binding on Consenting Property Owners.
> C. The MDA is the proper managing entity for the subject side roads.
> D. The MDA's Road Maintenance Agreements for the subject side roads are binding on Consenting Property Owners.

The court granted the motion.

The Welkers also filed a partial summary judgment motion, asking the trial court to enter an order finding that MDA is not a homeowners' association under chapter 64.38 RCW. MDA opposed the motion, arguing that its homeowners' association status "is not relevant to the Court's resolution" of this action. The trial court denied the Welkers' motion. At the hearing, it clarified that its ruling does not mean that MDA is a homeowners' association.

In June 2017, MDA and Widdoes filed another summary judgment motion, asking the trial court to declare the following as a matter of law and equity: (1) all

---

[3] Only the brief in support of the motion, not the actual motion, is in the record.

benefitted property owners are entitled to vote on an annual budget and majority rules, (2) MDA is the managing entity for all until two-thirds of all property owners vote otherwise, (3) MDA has enforcement rights, (4) MDA's formula for cost allocation of routine general maintenance and periodic resurfacing binds all owners, (5) owners of undeveloped parcels will be assessed at 25 percent, (6) owners share equally in MDA's operating expenses, and (7) owners are required to pay deposits to a reserve fund earmarked for periodic resurfacing.

In June 2017, the Welkers filed a cross motion for summary judgment. They asked the trial court to enter an order declaring that (1) no entity can manage the Road on behalf of owners who do not consent to such management and assign their individual ownership rights in the Road, (2) with respect to road maintenance, a majority of owners may not vote to impose expenses or grant themselves rights outside the scope of expenses and rights ordered by the trial court, and (3) any entity assigned individual ownership rights in the Road will not possess more enforcement rights than those possessed by the individual assigning owners.

Last, the Welkers asked the court to adopt their "Actual Use Method" for allocating road maintenance costs. They stated that, under their method, each owner pays only "for the area in square feet of the Road used by that Owner to his or her access point." The Welkers contrasted their method with MDA's method:

> The Association['s] [proportional method] treats the Road as non-exclusive, ignores the exclusive segments, and, instead of charging an Owner only for the square footage of the Road the Owner uses to access his or her parcel, accumulates the square footage of the Road and allocates a portion of the cost of maintenance up the Road to an Owner who does not use and has no rights to use the upper Road segments.

In its order on the parties' cross motions, the trial court first designated MDA as the "'Majority Owner Management Entity'" (MOME) for the Road, "until otherwise changed or modified by owners of a majority of Parcels, through an Owner Vote."[4] Next, it found that all property owners had an obligation to share in the costs of routine general maintenance of the Road, periodic resurfacing of the Road, and administrative expenses. It stated that "deposits to a reserve fund for future periodic resurfacing costs are appropriately categorized as necessary road-maintenance expenses and may be collected from Property Owners on an annual basis." And, it found that all assessments for road maintenance costs "must be approved by a vote of Property Owners." It determined that only owners who "are current on payment of all their assessments subsequent to entry of a Final Order in this matter" could vote on road maintenance cost assessments.

The trial court also adopted MDA's proposed method for allocating general maintenance and periodic resurfacing costs. It stated,

1. For each Parcel calculate a Parcel Numerator as follows: If the Parcel is a Developed Parcel then the Parcel Numerator shall be equal to the Area Actually Used in accessing said Developed Parcel. If the Parcel is an Undeveloped Parcel, then the Parcel Numerator shall be equal to a percentage "P" of the Area Actually Used in Accessing said Undeveloped Parcel, where the percentage P shall be specified in a further Order of this Court.

2. The amount assessed for a given Parcel shall be equal to the total amount assessed for all Parcels times the fraction X/Y, where X is the Parcel Numerator for said Parcel, and Y is the sum of the Parcel Numerators for all Parcels.

---

[4] The court stated that, as of the date of the order, the majority of owners had assigned their management rights to MDA. CP 480.

On October 2, 2017, the case went to trial on several unresolved issues, including the assessment discount rate for undeveloped parcels. After trial, the court entered the following finding of fact:

> 7.7 Assessing Owners of Undeveloped Parcels for all Road maintenance costs at a rate of only 25% of the assessment rate payable by Owners of Developed Parcels would result in all Property Owners sharing fairly in the cost to repair the degradation that is attributable solely to environmental factors.

It concluded that "Owners of Undeveloped parcels shall be assessed for Road maintenance costs at a rate equal to 25% of the rate used to assess Owners of Developed parcels." The court also entered a final order encompassing its prior rulings regarding the cost allocation method, reserve fund, and voting rights. The Welkers appeal.

## DISCUSSION

The Welkers make four arguments. First, they argue that the trial court exceeded its authority in selecting MDA's method for allocating road maintenance costs instead of their method. Second, they argue that the trial court exceeded its authority in ordering all property owners to pay into a reserve fund for future road maintenance. Third, they argue that the trial court exceeded its authority in limiting voting rights to property owners who are current on all assessment payments. Fourth, they argue that substantial evidence does not support the trial court's finding of fact regarding the assessment discount for owners of undeveloped properties.[5]

---

[5] The Welkers also argue that the trial court erred in denying their partial summary judgment motion for a declaratory ruling that MDA is not a homeowners' association under chapter 64.38 RCW. MDA did not argue below that it derives

I. Summary Judgment

The Welkers argue that the trial court exceeded its authority on summary judgment in selecting the cost allocation method, ordering property owners to pay into a reserve fund, and limiting voting rights to owners current on their assessment payments.[6] This court reviews summary judgment orders de novo. Hadley v. Maxwell, 144 Wn.2d 306, 310-11, 27 P.3d 600 (2001). Whether a trial court has the authority to order equitable relief is a question of law that this court reviews de novo. Kave v. McIntosh Ridge Primary Road Ass'n, 198 Wn. App. 812, 819, 394 P.3d 446 (2017).

A. Cost Allocation Method

The Welkers argue first that the trial court exceeded its authority in adopting MDA's cost allocation method, because it requires property owners to "pay for maintenance on sections of the Road sitting on easements they have no right to traverse." They assert that MDA's method treats "the easements creating the Road as non-exclusive." Instead of charging an owner for the square footage of the Road that owner uses to access his or her parcel, they state that MDA's method

its rights over the Road under chapter 64.38 RCW. At the hearing on the Welkers' motion, it stated that its homeowners' association status was "not dispositive of any issue." In its brief, it asserts that chapter 64.38 RCW "[p]lays [n]o [p]art in [t]his [c]ase." And, the trial court did not base its decision to designate MDA the MOME of the Road on MDA's statutory authority relative to chapter 64.38 RCW. Thus, whether or not MDA is a homeowners' association is of no consequence to this case. The trial court did not err in denying the Welkers' motion.

[6] For the first time in their reply brief, the Welkers argue instead that the trial court abused its discretion in ordering such relief. They still argue that the trial court lacked the "requisite equitable authority" in limiting voting rights. Pursuant to RAP 10.3, we do not consider the Welkers' arguments raised for the first time in their reply brief.

"aggregates the square footage of all access points." Thus, the "Owners at the bottom of the Road subsidize the cost of the maintenance of the Road for Owners who are located up the Road."

The parties agree that the easements over the Road do not contain any provisions allocating maintenance costs. They also agree that, under <u>Buck Mountain</u>, concurrent users of a shared easement with no road maintenance provisions must share in road maintenance costs. 174 Wn. App. at 720. They agree that the trial court has the equitable authority to fashion the allocation of those maintenance expenses.[7] Each proposed a method for doing so. Where they disagree is whether the trial court exceeded its authority when it ordered the method of allocation.

MDA proposed the following allocation method:

1. For each Parcel, calculate a Parcel Numerator as follows: If the Parcel is developed, then the Parcel Numerator shall be equal to the total area of the portion of the Main Road actually traversed in accessing the Parcel via the Furthest Access Point for the Parcel, starting from West Side Road. If the Parcel is

---

[7] Before the Welkers proposed their actual use method, they filed a partial summary judgment motion seeking a cost allocation method based on legal use. Their proposed legal use method would allocate costs among property owners based on their easement rights. The trial court denied the Welkers' motion, and granted MDA's motion seeking a cost allocation method based on actual use. The Welkers designated that order in their notice of appeal, but did not argue for the legal use method on appeal. <u>Northwest Properties Brokers Network, Inc. v. Early Dawn Estates Homeowner's Association</u>, 173 Wn. App. 778, 295 P.3d 314 (2013), provides an example of a cost allocation method based on legal use. There, a property owner, Fredericks, had an easement over a private road, which 31 other lots had signed an agreement to maintain, and 6 other lots used, including Fredericks's short plat, for a total of 37 lots. <u>Id.</u> at 782-83, 798. This court found that the trial court did not abuse its discretion in ordering Fredericks to "pay his pro rata share of actual maintenance costs," or 1/37th of the total cost to maintain the road. <u>Id.</u> at 799.

13

undeveloped, then the Parcel Numerator shall be equal to twenty-five percent (25%) of the total area of the portion of the Main Road actually traversed in accessing the Parcel via the Furthest Access Point for the Parcel, starting from West Side Road.

2. The amount assessed for a given parcel shall be equal to the total annual fee times the fraction X/Y, where X is the Parcel Numerator for said Parcel, and Y is the sum of the Parcel Numerators for all Parcels.

(Boldface omitted.)

Widdoes explained the reasoning behind MDA's method. He stated,

The MDA's allocation method allocates costs in proportion to "use made" (i.e., the total amount of the road traversed in accessing an owner's parcel) in accordance with private-road regulations pending in Washington State (HB 1494), and enacted private-road regulations of California and Oregon. Use made (Actual Use) is proxy for the amount of wear-and-tear caused to the road by the owner's vehicles. Because the MDA's allocation method allocates costs in strict proportion to use made (Actual Use), it assesses every owner exactly the same amount as every other owner per sq[uare]-f[oot] of the road actually used for access. As a result, each owner ends up paying costs for maintenance of the road in proportion to the amount of wear-and-tear that his vehicles cause to the road.

(Footnote omitted.)

The Welkers described their allocation method as follows:

• Parcel 1 pays for 1/84th of the cost of the square footage maintenance of the Road to its access point.
• Parcel 2 pays for 1/84th of the cost of the square footage of the Road to the first access point, then pays 1/83rd of the cost of the square footage of the Road to its access point.
• Parcel 3 pays 1/84th of the cost to the first parcel's access point, 1/83rd of the cost to the second parcel's access point, and 1/82nd of the cost to its access point, and so on up the Road.

They explained,

Under this methodology, no parcel is responsible for the cost of maintenance of the Road beyond its access point. Since the Road was also created through a series of exclusive easements that tie the Road together end to end, the Plaintiffs' [Actual Use Method] is

14

consistent with such easement exclusivity, even though some of the parcels may have the right to traverse the Road beyond their access point because it is not at the end of the particular easement segment.

To support their argument, the Welkers rely on Northwest Properties Brokers Network, Inc. v. Early Dawn Estates Homeowners' Association, 173 Wn. App. 778, 295 P.3d 314 (2013). There, Fredericks owned property that he accessed via a private road, 159th, within the Early Dawn Estates Homeowners' Association (EDE). Id. at 781-82. Fredericks had a nonexclusive easement for ingress, egress, and utilities along 159th. Id. at 782-83. Fredericks sued EDE, asking the trial court to determine that he was not required to pay road maintenance assessments to EDE. Id. at 787. The trial court determined that Fredericks was responsible for paying his pro rata share of expenditures by EDE for road maintenance and repair along 159th, but was not required to pay a $250 annual assessment paid by EDE members. Id. at 788. The annual assessment supported maintenance of roadways in addition to the shared easement Fredericks used to access his property. Id. at 783.

This court affirmed the trial court's ruling requiring Fredericks to pay only a pro rata share of expenses actually incurred by EDE for 159th. Id. at 804. The trial court had concluded that "EDE consists of 31 lots and that 6 other lots, including the 4 lots in Fredericks's short plat, use 159th. Thus, Fredericks's proportional share of road maintenance costs was 1/37th of the total cost to maintain 159th." Id. at 798-99 (footnote omitted). This court held that "[i]t was within the trial court's discretion to order that Fredericks was not required to pay EDE's annual road maintenance assessment but that he was required to pay his

15

pro rata share of actual maintenance costs." Id. at 799. It noted that EDE's annual assessments are applied "not only to maintenance of 159th, but also to other roads within the EDE subdivision." Id. at 797-98. It stated that Fredericks's legal obligations "do not extend to maintenance of those EDE roads." Id. at 798.

It is unremarkable to say that a person with no ownership interest in nor right to use certain property cannot be obligated to maintain that property. While the Welkers urge that Northwest Properties Brokers illustrates this point, neither party disputes this point. What is at issue is whether the trial court violated this principle.

We agree with the Welkers that the allocation method used by the trial court was in excess of its equitable authority. This result was inevitable since both MDA and the Welkers proposed methods that impermissibly shifted costs, not from one owner to another, but from one easement to another. This is not to say that either method would have been inappropriate if the Road were a single easement. But, the unique facts here require that each easement be evaluated separately.

The Road was established by easement in 1964. It exits onto West Side Road. Since then, six separate easements of varying lengths have been granted over portions of the Road, all of which terminate at West Side Road. Not only are the easements different lengths, but the identity and number of owners with use rights in each varies. Only the owners with rights in a particular easement are obligated to share in the costs of maintaining that easement. See id. at 788-89 (finding that property owner's legal obligations did not extend to maintenance of roads to which he held no easement rights).

16

The Welkers' and MDA's proposed methods treated the Road as a single easement. MDA's method shifted up road costs to down road owners by ignoring easement boundaries. And, the discount for undeveloped properties was shifted to all owners along the Road rather than shifted only among owners with rights in the same easement as the undeveloped property. The Welkers' method shifted costs to up road owners when portions of the easements up road from certain access points were not allocated among owners holding that easement.[8] Neither method treated the stacked easements separately, as the law requires.

The length of the Road and the six stacked easements were stipulated to.[9] The six stacked easements overlay the original easement that created the Road. The Road's area can be used to apportion the costs among the easements. The square footage of the seven easements should be added together to determine their combined area. Using the area of an individual easement as the numerator, and dividing by the combined area as the denominator, will yield the percentage

---

[8] For example, the third easement terminates at 82,020 square feet up the Road, but the last access point used for actual use allocation was at 79,040 square feet, leaving nearly 3,000 square feet within the easement not allocated to the owners with rights in that easement.

[9] The parties stipulate that the Road is comprised of six separate stacked and exclusive easements. It is clear from a survey map of the Road that it contains seven easements. The easement that created the Road is 60 feet wide, and runs the length of the Road. The six stacked easements overlay this original easement. All seven easements terminate at West Side Road. From that point, the easements are located as follows: auditors fee number (AFN) 58425 terminates 28,242 square feet up the Road, AFN 58888 terminates 54,036 square feet up the Road, AFN 58558 terminates 82,020 square feet up the Road, AFN 58559 terminates 98,346 square feet up the Road, AFN 58694 terminates 103,540 square feet up the Road, AFN 59472 terminates 134,612 square feet up the Road, and AFN 58585 terminates beyond the end of the chip-sealed portion of the Road. Because the parties stipulated that the chip-sealed portion of the Road ends at 145,728 square feet, that is the area of that easement that is under consideration.

of maintenance cost attributable to each easement. These percentages should be applied to the total maintenance costs to establish the amount owed by each easement. Within each easement, the trial court may determine whether a division of those costs should be divided equally among the easement holders (legal method), or whether some equitable adjustment (actual use or nonuse in the case of undeveloped properties) should be made. Equitable adjustments to reduce costs to some holders of an easement must be shifted to the remaining holders of the particular easement.

We reverse the trial court's determination that road maintenance expenses shall be allocated according to the formula set forth in the court's final order.

B. Reserve Fund

The Welkers argue second that the trial court exceeded its authority in ordering property owners to make contributions to a reserve fund managed by MDA for future road maintenance. They state that the court "created a de facto contract between the Owners and the third party managing the reserve fund." The Welkers assert that the right to assign management of an owner's money "is clearly a personal contractual right," requiring the owner's consent. Thus, they argue that "the trial court cannot order what, in the absence of a covenant or recorded document establishing such right, is clearly a contractual right."

In its final order, the trial court stated,

> 3. Costs of Period Resurfacing/Reserve Fund. All Property Owners have an obligation to share in the costs to periodically resurface the chip-sealed Road. Deposits to a reserve fund for future periodic resurfacing costs are appropriately categorized as necessary road-maintenance expenses and may be

18

collected from Property Owners on an annual or special basis. Such reserve fund shall be used exclusively for resurfacing of the Road, including preparation for resurfacing. . . . A MOME, or other group of Property Owners owning a majority of all Parcels and acting collectively, by and through an Owner Vote, is entitled to collect and hold the reserve fund in trust for all Property Owners.

Citing Buck Mountain, the Welkers state that trial courts "possess . . . the 'equity power to impose reasonable road maintenance obligations where no [road maintenance] agreement exists.'" (Quoting Buck Mountain, 174 Wn. App. at 716 (emphasis added.) But, they maintain that this power does not extend to "items like administrative expenses and reserve funds."[10] Relying on Visser v. Craig, 139 Wn. App. 152, 160, 159 P.3d 453 (2007), they argue that the trial court's equity power is limited by the actual covenants that created the shared roadway. Visser involved a question of an easement by necessity. 139 Wn. App. at 158. It did not address allocation of maintenance obligations among easement users. Nothing in the case contradicts this court's later decision in Buck Mountain on imposition of reasonable road maintenance obligations.

The Welkers also argue that "the trial court's equity power is limited solely to road maintenance." In Buck Mountain, this court clarified that there is "well-settled case authority holding that, absent agreement, joint use of an easement creates an obligation to share costs." 174 Wn. App. at 720. It also concluded that "the trial court's inherent equity power includes the authority to apportion

---

[10] In addition to ordering property owners to pay into a reserve fund, the trial court determined that all owners have an obligation to share in "administrative expenses incurred by a MOME that are essentially unavoidable, and therefore necessary, including, without limitation, expenses related to calculating, documenting, and collecting assessments, accounting for expenditures, and arranging and overseeing maintenance of the Road." The Welkers did not assign error to this determination.

reasonable road maintenance costs based on the circumstances of each case." Id. at 726 n.26. Here, the trial court ordered that the reserve fund be used exclusively for "resurfacing of the Road." The Welkers do not argue that resurfacing does not constitute road maintenance. Nor do they argue that compelling property owners to pay into a reserve fund is an unreasonable road maintenance obligation.

The Welkers argue that, in ordering them to pay into a reserve fund, the trial court created a "de facto contract" between them and MDA. They cite no authority for this argument. Buck Mountain requires contribution to maintenance costs, not a contract to share those costs. See id. at 720. The trial court did not order the Welkers to enter into a contract with MDA. Rather, it determined that, by virtue of their joint use of an easement over the Road, they have an obligation to share in periodic resurfacing costs. And, it found that deposits to a reserve fund for future periodic resurfacing costs are "necessary road-maintenance expenses" that an MOME may collect from them. The trial court did not create a de facto contract.

The trial court's equity power "is inherently flexible and fact-specific." Proctor v. Huntington, 169 Wn.2d 491, 503, 238 P.3d 1117 (2010). This court has declined "to adopt a fixed rule for delimiting the court's inherent equity power to allocate maintenance costs based on the particular facts and equity of a case." Buck Mountain, 174 Wn. App. at 725. Resurfacing costs were a proper part of maintenance. Requiring deposits to a reserve fund to pay for future resurfacing costs was not an unreasonable requirement to ensure all owners participated in the joint maintenance obligation.

20

Accordingly, the trial court did not exceed its equitable authority in ordering property owners to pay into a reserve fund to cover periodic resurfacing costs.

## C. Voting Rights

The Welkers argue third that the trial court exceeded its authority when it "limited voting on future assessments to Owners who are current on past assessments." They assert that "[n]o case law or statutory provision supports a rule that an owner, just because they are in default on payment, has no right to vote on assessments for expenditures to be made in the future." The Welkers contend that this rule "creates a paradoxical situation" where owners "cannot decide when and how much to pay for assessments unless they can vote, but they cannot vote unless they have paid all past assessments in full."

In its final order, the trial court stated,

> Only Property Owners who are current in their payment of all assessments subsequent to entry of a Final Order in this matter ("Paid-Up Property Owners") may cast votes to approve or disapprove the proposed budget and assessment. One vote may be cast for each Parcel owned by a Paid-Up Property Owner, without regard to the number of persons or entities who may collectively own such Parcel.

The Welkers cite no authority to support their argument that the trial court exceeded its equitable authority. They rely on the absence of cases or statutes supporting a trial court's holding that "only owners current on all past assessments can vote on future assessments." This court is not required to consider arguments not supported by authority. Mercer Place Condo. Ass'n v. State Farm Fire & Cas. Co., 104 Wn. App. 597, 606, 17 P.3d 626 (2000).

21

In Buck Mountain, this court considered a similar argument. There, Bentley and Prestwich owned property accessed via a road maintained by the Buck Mountain Owners Association (Association). Buck Mountain, 174 Wn. App. at 707-08, 710-11. They were not members of the Association. Id. at 711. The Association sued Bentley and Prestwich after they failed to pay road maintenance fees. Id. at 711-12. The trial court ordered them to pay a certain percentage of road maintenance costs regularly assessed by the Association on its members. Id. at 712.

On appeal, Bentley and Prestwich argued in part that the trial court's "imposition of a road maintenance obligation" subjected them to taxation without representation, because it "provide[d] the Association unilateral authority to set the amount of their annual road maintenance obligation." Id. at 728. They cited no authority "holding that an equitable cost-sharing obligation is invalid unless accompanied by the right to vote on those costs." Id. Accordingly, this court determined that their claim failed. Id.

The trial court did not exceed its broad equitable authority by limiting voting rights to property owners who are current on all assessment payments.[11]

II.  Substantial Evidence

The Welkers argue last that the trial court abused its discretion in making a finding of fact regarding the assessment discount for owners of undeveloped

---

[11] Because we conclude that the trial court did not exceed its authority, we do not address MDA's justiciability and standing arguments.

properties. They assert that the court ignored the parties' stipulation and the facts presented.

The trial court entered the following finding of fact regarding the assessment discount:

> 7.7    Assessing owners of Undeveloped Parcels for all Road maintenance costs at a rate of only 25% of the assessment rate payable by Owners of Developed Parcels would result in all Property Owners sharing fairly in the cost to repair the degradation that is attributable solely to environmental factors.[12]

This court reviews the trial court's findings of fact for substantial evidence. Merriman v. Cokeley, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). Substantial evidence is that which would persuade a fair-minded, rational person of the declared premise. Id. A reviewing court will not disturb findings of fact that are supported by substantial evidence, even if there is conflicting evidence. Id. Unchallenged findings are verities on appeal. Id. This court may affirm on any basis supported by the evidence. Ladenburg v. Campbell, 56 Wn. App. 701, 703, 784 P.2d 1306 (1990).

At trial, the Welkers and MDA stipulated to the following facts:

1. Owners of undeveloped parcels make de minimis use of the road and should be assessed nothing (0%) for routine road maintenance and for repairing wear-and-tear caused by owners of developed parcels.
2. However, even if there were no traffic on the road, the road would still need to be resurfaced occasionally, because weathering (oxidation, sun, wind, water, weeds and moss) damages the surface of the road (collectively, "Environmental Damage").

---

[12] The Welkers do not specifically identify this finding of fact, nor any other findings of fact, in their brief. But, because they refer to the finding of fact "[r]egarding the [a]ssessment [d]iscount for [o]wners of [u]ndeveloped [p]roperties," we construe their argument as referring to finding of fact 7.7.

3. Arguably, owners of <u>undeveloped parcels should share equally in that portion of the cost of resurfacing that is attributable to repairing Environmental Damage alone.</u>

They also agreed that with normal traffic, the Road needs to be resurfaced every 7 to 10 years. But, they disagreed as to how often the Road would need resurfacing due to environmental damage alone.

The Welkers argue that their unused driveway, which needs resurfacing after only 6 years, is "the best evidence that a chip sealed road" with no traffic "would still need to be resurfaced within the same 7 to 10 year time frame." Mike Carlson, a general contractor, testified that the Welkers' unused driveway looks like it needs resurfacing after only six years. As a result, the Welkers proposed assessing undeveloped parcel owners the full cost of resurfacing the Road.

In contrast, testimony by Carlson, Widdoes, and another property owner, John Meyerott, indicates that the Road would need resurfacing every 14 years due to environmental damage alone. Widdoes testified that the resurfacing cycle of Larkspur Lane, a lightly trafficked side road, is 14 years. Larkspur Lane and Nighthawk Lane, another lightly trafficked side road, received chip sealing in 2011. Based on Larkspur Lane's condition, Meyerott testified that he would recommend the owners wait another seven years before they chip seal the road again. When asked if either road needed sealing "any time soon," Carlson responded that they "[l]ooked pretty good."

And, Carlson testified that Larkspur Lane is a better comparison to the Road than the Welkers' unused driveway. He stated that "the right traffic over a road

24

with substrate will last longer than one that's been left," and explained that the Welkers' unused driveway would probably degrade faster due to weather.

In calculating MDA's proposed assessment rate for undeveloped parcel owners, Widdoes testified that MDA put together a calculation that "inputs a lifetime and outputs a . . . percentage." MDA chose to input an 18 year lifetime for the Road.

MDA stated that the cost of applying a new surface to the Road is approximately $100,000, and the total cost of maintenance over a 7 year resurfacing cycle is $156,000. To determine the fraction of resurfacing costs attributable to environmental damage alone, it divided 7 years, the Road's resurfacing cycle, by 18 years, the number it chose as the Road's resurfacing cycle if the only source of degradation was environmental damage. Thus, 7 divided by 18 is approximately 39 percent.

Next, to determine the amount of resurfacing costs attributable to environmental damage alone, MDA multiplied $100,000, the resurfacing cost, by 39 percent. It then took that amount, $39,000, and divided it by the total cost of maintenance over a 7 year resurfacing cycle, $156,000, to reach 25 percent. MDA concluded that 25 percent is "a fair assessment rate for undeveloped parcels."

In his testimony, Widdoes clarified,

> The MDA method says that this $38,000 over a seven-year cycle will be shared equally among undeveloped and developed parcels. And it does that not by saying that you're going to pay 38 percent of resurfacing costs. It says, it says that by saying that you're going to pay 25 percent of all costs.

The trial court found that assessing undeveloped parcel owners for road maintenance costs at a rate of 25 percent of the rate payable by developed parcel owners "would result in all Property Owners sharing fairly in the cost to repair the degradation that is attributable solely to environmental factors." The trial court had the authority to choose a calculation method. However, the calculation here assumes the Road's resurfacing cycle would be 18 years if the only source of degradation was environmental damage.

The question was how often the Road would need resurfacing due to environmental damage alone. The evidence about unused roads indicates a 7 to 10 year resurfacing cycle and suggests that they break down faster than lightly used roads. The evidence of a 14 year resurfacing cycle was for lightly used roads. No direct evidence supports an 18 year resurfacing cycle.

The only testimony about an 18 year cycle was from Widdoes in explaining his proposed calculation: that 18 years is in a range "that seems to be consistent with the roads we looked at." He also stated that he has "no expertise to say what the number means." Widdoes further testified that 69 percent of all parcels agreed that 25 percent is a fair number. He explained that 18 years is the number that is consistent with a 25 percent assessment rate for undeveloped parcels. This agreement among the owners is not evidence that the Road's resurfacing cycle would be 18 years if the only source of degradation was environmental damage.

Accordingly, substantial evidence does not support finding of fact 7.7, which states that a 25 percent assessment rate for undeveloped parcels would result in all owners sharing fairly in the cost to repair the degradation that is attributable

26

solely to environmental factors. As a result, this finding of fact must be stricken. In this absence of substantial evidence, conclusion of law 7, which states that "Owners of Undeveloped Parcels shall be assessed for Road maintenance costs at a rate equal to 25% of the rate used to assess owners of Developed Parcels," must also be stricken.

We reverse the cost allocation method and calculation of the discount for undeveloped properties, otherwise affirm, and remand to the trial court for further proceedings consistent with this opinion.

_Appelwick, C.J._

WE CONCUR: